425 So.2d 710 (1982)
STATE of Louisiana
v.
Alvin Scott LOYD.
No. 82-K-0747.
Supreme Court of Louisiana.
November 29, 1982.
Rehearing Denied February 11, 1983.
*712 Gordon Hackman, Randy Lewis, Boutte, for relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Morel, Jr., Dist. Atty., John Crum, Abbott J. Reeves, Jr., Asst. Dist. Attys., for respondent.
DENNIS, Justice.
The defendant, Alvin Scott Loyd, who has been indicted for first-degree murder and aggravated rape, unsuccessfully moved the trial court for suppression of evidence, discovery and Brady orders. We granted the defendant's application for review of these pre-trial rulings. 414 So.2d 780 (La. 1982).
On the evening of April 26, 1981, Tina Giovanetti and her three year old daughter were walking home after attending a fair in Terrebonne Parish. They accepted defendant's offer of a ride in his pick-up truck. When he reached the Giovanetti home, the defendant asked if he could come in. The woman refused his request and stepped out of the truck. Before she could remove her daughter, however, the defendant drove off with the little girl inside the cab. The defendant traveled to the Mississippi River, crossed into St. John the Baptist Parish on the Lutcher ferry, and continued down a desolate dirt road near a pipeline. At a remote spot, he raped the child, drowned her in a ditch, carried her body into an adjacent swamp, and covered it with leaves.
Ms. Giovanetti reported the kidnapping of her daughter to the police and described the offender and his truck. Armed with this and other information, the St. John the Baptist Parish police contacted the defendant at his home early the next morning and requested that he accompany them to the sheriff's office. He willingly got dressed and drove his truck to the stationhouse. Interrogation and other events ultimately culminated in the defendant leading the sheriff to the victim's body and giving a written confession.
The defendant initially assigns as error the trial judge's failure to suppress the defendant's statements, certain items of physical evidence and the identification of the defendant by other witnesses.

ASSIGNMENT OF ERROR NUMBER ONE
The first statement that the defendant moved to suppress was one he made to two St. James Parish deputies who stopped him just after midnight on April 27, 1981, and conducted a field sobriety test because he had been driving to the left of the center line. The defendant passed the test, informed the deputies that he was tired and was trying to catch the 12:15 Lutcher ferry. He added that his little girl was in the truck with him and that they were returning home from the fair. Unaware of the reported kidnapping in Terrebonne Parish, the deputies allowed the defendant to continue.
The deputies did not give the defendant his Miranda warnings upon stopping him. However, in State v. Badon, 401 So.2d 1178 (La.1981), we held that these warnings are not required before the administration of a field sobriety test. Furthermore, there is no suggestion that defendant's remarks were solicited by the deputies; rather the evidence indicates that defendant's statement that he had his young daughter with him was a spontaneous statement and is independently admissible. State v. Robinson, 384 So.2d 332 (La.1980); State v. George, 371 So.2d 762 (La.1979); State v. Thornton, 351 So.2d 480 (La.1977).
The second statement at issue was evoked by the identification of him as the kidnapper by Mrs. Giovanetti, the victim's mother, in St. John the Baptist Parish Sheriff's Office around 4:30 a.m. after the defendant voluntarily came there for questioning. The defendant seeks the suppression of the testimony concerning the woman's identification and his exculpatory response to her accusation.
Mrs. Giovanetti accompanied the Houma police officers to the St. John the Baptist Sheriff's Office to see if the defendant *713 resembled her child's abductor, but the evidence is devoid of any hint that her identification of him as the kidnapper was suggested by the officers. She entered the Sheriff's Office through the back door and spotted the defendant sitting in the officer's lounge through an open door. No one drew any attention to the defendant or the room where he was sitting. The encounter was brief and accidental; her identification was definite and immediate. In these circumstances, because there is no indication of police suggestions, and because the witness made a positive identification upon spotting the suspect, the out-of-court identification was reliable and properly admissible. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).
Mrs. Giovanetti was escorted away by Detectives Vito and Duplantis from Houma, who immediately returned to introduce themselves to defendant and give him the Miranda warnings. They testified that defendant acknowledged his understanding of these rights, did not invoke his right to silence, but instead stated that he did not know what the "crazy lady" was talking about. We need not resolve the question of whether defendant was in "custody" at the time of his statement, because the remark was made after defendant had received, apparently comprehended, and decided not to invoke his Miranda rights. In any event, this particular statement by the defendant was not incriminating in any way. Beyond the Miranda question, the evidence clearly reflects, contrary to defendant's contention, that his unsolicited spontaneous response to the accusation was freely and voluntarily made and thus is admissible.
The most serious questions raised by defendant's motion to suppress concern statements made by the defendant to the authorities after he invoked his right to silence. Before discussing these issues, we will set forth in detail the factual context within which they arise.
Deputy Fuselier of the St. John the Baptist Parish Sheriff's Department testified that he arrived at the office early in the morning of April 27, 1981. The policemen from Houma were with defendant when Fuselier entered the room. Fuselier gave defendant his Miranda rights and at approximately 5:00 a.m. defendant informed Fuselier that he did not wish to speak to him. Fuselier said that he called defendant's mother to the office so that she could talk with him. According to Fuselier, the mother spoke with defendant alone for approximately 30 to 40 minutes, perhaps as long as an hour. An officer testified that Mrs. Loyd left her son sitting in the lounge and related to the police that defendant said he would take the police officers to the place where he had dropped off the child near Lutcher. Mrs. Loyd disagrees that defendant made such an offer; she testified that defendant only told her that he had dropped the child off near the Lutcher ferry landing.
Immediately, Oubre, Duplantis (from Houma), defendant and his mother went to Lutcher to locate the child. Before they left at approximately 6:15-6:30 a.m., Fuselier read the Miranda rights to defendant and his mother. Defendant refused to sign the form. Oubre testified that enroute to Lutcher, which is in St. James Parish, he advised St. James officials of the situation and requested assistance in searching for the child. When the group arrived in St. James Parish, they were met by the two St. James deputies who had stopped defendant earlier in the morning. These two men identified defendant as the man they had stopped and who told them that he had his little girl in the truck. Oubre stated that the meeting was a coincidence, that he had not requested these specific men to meet them. Defendant directed the group to the location where he asserted that he had left the girl and the search began by knocking on doors to inquire whether anyone had seen her. A State Police helicopter was also used in the search, but to no avail.
Oubre returned the group to the St. John sheriff's office at around 7:30 a.m. At this time, Fuselier placed defendant under arrest on a fugitive warrant from Terrebonne Parish which Vito had obtained while defendant was on the trip to Lutcher. Vito *714 had explained that he did not effect the arrest because he was out of his jurisdiction. When Fuselier arrested defendant, Oubre gave defendant his Miranda rights. Fuselier repeated the rights and defendant stated that he did not understand. When questioned about what he did not understand, defendant did not respond.
Defendant remained alone in custody until shortly before 11 a.m. that morning when his mother sought permission to talk to defendant from Lloyd Johnson, Sheriff of St. John Parish. The sheriff allowed the visit, asking only that Mrs. Loyd try to elicit from defendant the whereabouts of the missing child. Mrs. Loyd talked with defendant a while. When she left the room where defendant was sitting, Sheriff Johnson asked whether defendant had said anything about the location of the girl and Mrs. Loyd replied that he had not. Mr. Crump, a friend of Mrs. Loyd, requested permission to speak with defendant and the sheriff granted the permission, hoping that defendant might tell him something he had not told his mother. When Crump came out, Mrs. Loyd went back into the room. The sheriff requested that she ask her son if he would talk to him and Deputy Rome. According to Sheriff Johnson and Deputy Rome, Mrs. Loyd returned and said that defendant had consented to speak to them. Mrs. Loyd testified that her son manifested no willingness to speak to the officers, and that she had not indicated any such willingness to Sheriff Johnson.
Sheriff Johnson and Deputy Rome entered the room and Johnson gave defendant the Miranda rights. Defendant said that he did not understand the rights. The sheriff told defendant that he would read each right slowly. After reading the first one the right to remain silent and that anything said could be used in courtthe sheriff again asked defendant if he understood. Defendant said he did not. The sheriff asked defendant what it was he did not understand. According to Johnson, defendant said "okay", he "kind of smiled" and said "I understand." Although defendant did not wish to sign the form, he did say that he would answer questions. The sheriff asked defendant whether it was possible that the little girl was still alive and defendant responded by asking for a piece of paper. Deputy Rome handed defendant paper and defendant began drawing lines on it. When asked the meaning of the lines, defendant explained that "this is the map of where the little girl is" and identified landmarks. Rome left to search for the child in the hope that she might be found alive. After Rome left, defendant indicated to Johnson that the child was dead and Johnson asked defendant whether he had raped her. Defendant answered that he had.
Rome called from the field to report that he and others were unable to locate the child and to ask whether it might be possible for defendant to show him the location. At Fuselier's request, defendant consented to lead the police to the child's body. Johnson testified that he had instructed Fuselier to be certain to give defendant his rights when asking him to go to the scene, but stated that he did not know whether Fuselier had done so. However, enroute to the scene, Fuselier, in Johnson's presence, did give defendant his rights. Fuselier then asked defendant whether he was sure the little girl was dead and defendant responded that there was no way she could still be alive. Defendant explained that he had held her face under water in a ditch until the bubbles stopped coming to the surface and then continued to hold her down until she stopped moving completely. In response to Fuselier's inquiry whether he had raped the child, defendant replied that he had "jugged her twice."
At the scene, defendant got out of the patrol car and walked to where Rome and Oubre were standing beside a drainage ditch. Defendant, handcuffed to the rear, made a gesture with his foot toward the canal and said that "this is where I drowned her at." Defendant then turned around and walked into a wooded area to a place where there was palmetto on the ground. Again he made a gesture with his foot and said "she is right there" and then turned around.
*715 Later in the afternoon, after defendant had been returned to the jail, Fuselier and Oubre interviewed defendant and obtained a written statement. Fuselier advised defendant of his Miranda rights and asked defendant if he understood. Defendant replied that he did not and Fuselier went over the rights slowly. Again defendant said that he did not understand. Fuselier asked defendant what it was he did not understand and offered to have someone else explain the rights. Fuselier testified that defendant "kind of laughed and said `yes, I understand, it's all right.'" Fuselier gave the form to defendant, who appeared to be reading it and indicated that he understood. Fuselier filled in the top of the form. Defendant said that he was nervous and asked that the police write the statement. Fuselier received a phone call; so Oubre continued the interview, writing the statement while Fuselier remained in the room talking on the phone. At the end of the statement, defendant read it and signed each page. Both Fuselier and Oubre testified that defendant was not coerced or threatened nor promised anything to make the statement and both said that he appeared calm.
At the time of these events, the defendant was 25 years old and had one and one-half or two years of college while making good grades. He had attended "Storekeepers' School" in the Navy and he was a foreman at the Godcheaux sugar plant. He was married and the father of a child.
The trial judge accepted the version of these events recited by the police where it differed from the testimony of Mrs. Loyd. When we review a ruling of the trial court based upon a finding of fact, great weight is placed upon the determination of the court below because the trial judge had the opportunity to observe the witnesses and weigh the relative credibility of their testimony. State v. Alford, 384 So.2d 761 (La.1980); State v. Sullivan, 352 So.2d 649 (La.1977); State v. Cobb, 350 So.2d 168 (La.1977). These findings will not be disturbed unless they are not supported by the evidence. State v. Dewey, 408 So.2d 1255 (La.1982); State v. Castillo, 389 So.2d 1307 (La.1980) cert. denied 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1004 (1981); State v. Williams, 386 So.2d 1342 (La.1980). The consistent testimony of the investigating officers provides ample support for the trial judge's factual findings.
These events, during which defendant made incriminating statements shortly after having asserted his right to silence or professed ignorance of such right, indicate a possible violation of the prophylactic rules established in Miranda v. Arizona. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Miranda guidelines were adopted because without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely. Miranda v. Arizona, supra, Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). To assure safeguards that promised to dispel the "inherently compelling pressures" of police custodial interrogation, a prophylactic rule was fashioned to supplement the traditional determination of voluntariness on the facts of each case. Michigan v. Mosely, 423 U.S. 96, 96 S.Ct. 321, at 330, 46 L.Ed.2d 313 at 327 (1975) (Brennan, J., dissenting).
Resolution of the questions in this case depends on the interpretation of a single passage of the Miranda opinion:
Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at a time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege: any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. 384 U.S. at 473-474, 16 L.Ed.2d 694, 86 S.Ct. 1602.
*716 Subsequently, the high court observed that the critical safeguard identified in this passage is a person's right to cut off questioning. Although the passage could be read to mean that a person who has invoked his right to silence can never again be subjected to custodial interrogation, or interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite, the court chose a middle course. It concluded that the admissibility of statements obtained after the person in custody has decided to remain silent depends on whether his "right to cut off questioning" was "scrupulously honored." Through the exercise of his option to terminate questioning, he can control the time of when questioning occurs, the subjects discussed, and the duration of questioning. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. Michigan v. Mosley, 96 S.Ct. at 326, 46 L.Ed.2d at 321.
The restraints placed upon the interrogator when the suspect invokes his right to silence are to be contrasted with the more stringent safeguard called forth by his request for an attorney. In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the high court expressly held that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. 101 S.Ct. at 1884, 68 L.Ed.2d at 386.
Consequently, when the accused invokes his right to silence, Miranda does not erect a complete bar to further police initiative in communications as it does after a request for an attorney. Nevertheless, the police must scrupulously honor the right to cut off questioning by the person in custody. Apparently, courts must look to the facts of each case and the precepts underlying Miranda to determine if the police engaged in conduct in obtaining a confession which destroyed the accused's confidence in his right to cut off questioning.
Although the Supreme Court has not clearly resolved the issue, it appears that defendant Loyd is unable to invoke Miranda. Professor Kamisar has persuasively demonstrated that even though a person is in custody, "surreptitious interrogation" is insufficient to bring Miranda into play. For unless a person realizes he is dealing with the police, their efforts to elicit incriminating statements from him do not constitute "police interrogation" within the meaning of Miranda. It is the impact on the suspect's mind of the interplay between police interrogation and police custody each condition reinforcing the pressures and anxieties produced by the other which creates "custodial interrogation" within the meaning of Miranda. It is the suspect's realization that the same persons who have cut him off from the outside world, and have him in their power and control, want him to confess, and are determined to get him to do so, that makes the "interrogation" more menacing than it would be without the custody and the "custody" more intimidating than it would be without the interrogation. Miranda recognizes that the Fifth Amendment only protects against some kind of compulsionand not the kind produced by custody alone. In the absence of police interrogation, the coercion of arrest and detention does not rise to the level of "compulsion" within the meaning of the privilege. Kamisar, Brewer v. Williams, Massiah and Miranda: What is "Interrogation"? When Does it Matter?, 67 Georgetown L.J. 1, 50-53, 63-69 (1978).
The Supreme Court apparently confirmed the validity of this analysis by implying that Miranda could not be applied to suppress an accused's incriminating custodial statement to a fellow inmate because Miranda is "limited to custodial police interrogation." See U.S. v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (emphasis added); W.S. White, Interrogation Without Questions: Rhode Island v. Innis and United States v. Henry, 78 Mich.L.Rev. *717 1209, 1247 (1980). Similarly, the Fifth Amendment has been held not to be implicated by the use of undercover government agents before charges are filed because of the absence of the potential for compulsion. See Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).
In the present case, during the times that defendant Loyd exercised his right to cut off questioning, he was not subjected to the interplay between police custody and police interrogation which is necessary to constitute "custodial interrogation" within the meaning of Miranda. When the defendant invoked his right to silence, the police ceased their interrogation immediately and did not resume questioning until they were invited to do so by the defendant. While police interrogation was cut off, the defendant was questioned by his mother out of the officers' presence, and she elicited incriminating statements from him. She was not a police officer or agent, however, and there was no reason for the defendant to think that he was dealing with the police in talking to his own mother. Because the defendant was a mature adult of 25 years with substantial education, apparent intelligence and lived separately from his mother with a wife and child of his own, we do not think his mother's entreaties to reveal the child's location caused him to believe that his right to control or cut off questioning would not be honored by police. Consequently, in the absence of any interplay between police custody and police interrogation, the mere fact that the defendant was in custody was not so intimidating, nor his mother's questioning so menacing, as to bring Miranda into play. Similarly, Mrs. Loyd's request that defendant talk to Sheriff Johnson later that morning was not an impermissible resumption of custodial interrogation. The inherent pressures of the custodial environment, without the companion pressures of police interrogation, are not a sufficient compulsion on which to conclude that the police did not scrupulously honor defendant's right to silence. State v. Rebstock, 418 So.2d 1306 (La.1982). In both instances, defendant made his decision to initiate renewed contact with the police without receiving custodial interrogation or pressure from them. When an accused initiates communication on the subject with police after earlier invoking his right to silence, the police may permissibly resume the interrogation. Michigan v. Mosley, 96 S.Ct. at 327, 46 L.Ed.2d at 322.
Although the police scrupulously honored defendant's right to silence, the resulting statements are only admissible if made freely and voluntarily by the defendant. The State bears the burden of proving beyond a reasonable doubt the voluntariness of a confession which the defendant has moved to suppress as evidence at the trial on the merits. La.R.S. 15:451; State v. Rodrigue, 409 So.2d 556 (La.1982); State v. Dewey, 408 So.2d 1255 (La.1982); State v. Jones, 376 So.2d 125 (La.1979); State v. Volk, 369 So.2d 128 (La.1979). In reviewing the trial judge's rulings as to the admissibility of a confession, his conclusions on credibility are entitled to the respect due those made by one who saw the witnesses and heard them testify. State v. Rodrigue, supra, State v. Bouffanie, 364 So.2d 971 (La. 1978).
From our review of the record, we conclude that the trial judge's finding that the defendant's statements were freely and voluntarily given is adequately supported by the consistent testimony of the sheriff deputies and Houma detectives. Accordingly, this statement is properly admissible at the trial on the merits.
The defendant also seeks the suppression of items of physical evidence taken from his truck pursuant to a warrantless search by the police. When the defendant was taken into the sheriff's office in the early morning of April 27, 1981, he parked his truck beside the sheriff's office building. At 9:30 that morning, a Jefferson Parish crime scene technician arrived at the sheriff's office to assist in the investigation. Soon after arriving, this technician undertook a warrantless search of the interior of defendant's pick-up truck. This search produced a face cloth, a paper tower and T-shirt on the floor of the truck, and a face cloth on the passenger seat.
*718 The constitutional prohibitions against unreasonable searches and seizures encompass protection against unreasonable intrusions into a person's automobile. U.S. Constitution, Art. IV; La. Const. Art. I, § 5; Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). A warrantless search is per se unreasonable unless it falls within certain limited, well-delineated exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1974); Coolidge v. New Hampshire, supra; State v. Hernandez, 410 So.2d 1381 (La.1982); State v. Zito, 406 So.2d 167 (La.1981).
At the time the truck was searched, the police had reasonable cause to believe that the kidnapped child was still alive and in imminent and serious danger. The facts then known to the police gave the police probable cause to believe that the defendant had kidnapped the girl in the truck and that it held possible clues to the location of the victim. We believe that this search was permissible under the exigent circumstances presented by the pressing need to rescue the victim.[1] The warrant requirement must yield to the overriding interest in protecting or rescuing individuals reasonably thought to be in imminent danger of death or serious bodily harm. United States v. McKinney, 477 F.2d 1184 (D.C.Cir.1973); United States v. Perez, 440 F.Supp. 272 (N.D.Ohio 1977); People v. Sirhan, 7 Cal.3d 710, 102 Cal.Rptr. 385, 497 P.2d 1121 (1972); LaFave, Search and Seizure: A Treatise on the Fourth Amendment, 1978. This warrantless entry into the defendant's truck was authorized under these circumstances, and accordingly, the fruits of this search are properly admissible into evidence.
Finally, the defendant seeks the exclusion of a pubic hair taken from the defendant after he was incarcerated. A detective approached the defendant and informed him that he needed a sample of pubic hair for the investigation. He further told defendant that a search warrant could be obtained if necessary. The defendant replied that he would willingly cooperate and then removed a sample himself.
Consent is an exception to the necessity of obtaining a warrant to seize evidence. State v. Winn, 412 So.2d 1337 (La.1982); State v. Packard, 389 So.2d 56 (La.1980). The record lends substantial support to the trial court's determination that the defendant consented to the procurement of this evidence. This evidence is therefore admissible.

ASSIGNMENT OF ERROR NUMBER TWO
By this assignment, the defendant complains that the trial judge did not order the state to comply with the usual discovery procedure followed in St. John Parish. The defendant contends that it is customary practice of the prosecution in St. John Parish to make its entire file available to the defense attorney. In his motion for discovery, defendant requested the names of all witnesses the state intends to use at trial.
The state is not required to allow the defendant to inspect its entire file. La.C.Cr.P. art. 723.[2] Moreover, this court *719 has consistently held that the defendant is not usually entitled to the names of state witnesses. State v. Lane, 414 So.2d 1223 (La.1982); State v. Marks, 337 So.2d 1177 (La.1976); State v. Thomas, 306 So.2d 696 (La.1975); c.f. State v. Walters, 408 So.2d 1337 (La.1982). We find no merit in this assignment.

ASSIGNMENT OF ERROR NUMBER THREE
By this final assignment, the defendant contends that the trial judge erred in failing to compel the state to produce Brady material. In brief, the defendant asserts that the failure of the state to allow him to inspect its entire file prejudices his rights to discover Brady material. The defendant does not assert that the state is withholding such material, but only that its failure to open its files precludes the verification that no such material in fact exists. The mere chance that a full inspection of the file will reveal Brady material does not justify a fishing expedition through the state's file in the face of the clear language of La.C.Cr.P. art. 723. We find no merit in this assignment.

DECREE
For the reasons assigned, the ruling of the trial court on the motion to suppress statements and physical evidence is affirmed. The ruling on the motions for discovery and Brady materials is also affirmed.
MARCUS, J., concurs in the result only.
WATSON, J., concurs in the result.
LEMMON, J., assigns additional concurring reasons.
LEMMON, Justice, assigning additional concurring reasons.
I fully subscribe to the reasoning and result of the majority opinion. I additionally point out that the prophylactic rules of Miranda (designed to protect against "overzealous police practices") were not designed to regulate police interrogation which (as in this case) was undertaken primarily for the purpose of discovering information necessary to preserve the life of an innocent victim (such as the missing three-year old in this case) or to insure the safety of the investigating police officer and others on the scene. See U.S. v. Castellana, 500 F.2d 325 (5th Cir.1974); State v. Levy, 292 So.2d 220 (La.1974); People v. Dean, 39 Cal. App.3d 875, 114 Cal.Rptr. 555 (1974); People v. Riddle, 83 Cal.App.3d 563, 148 Cal. Rptr. 170 (1978).
NOTES
[1] The trial judge erroneously decided that these items fell within the "plain view" exception to the warrant requirement. The "plain view" doctrine properly provides a means of securing probable cause; it does not excuse the necessity of securing a warrant based on a showing of probable cause to effect an entry into a protected area. Coolidge v. New Hampshire, supra, State v. Parker, 355 So.2d 900 (La.1978). The failure of the police to obtain a warrant to enter the truck was not excused by the "plain view" doctrine.
[2] La.C.Cr.P. art. 723 provides: "Except as provided in Articles 716, 718, 721, and 722, this Chapter does not authorize the discovery or inspection of reports, memoranda or other internal state documents made by the district attorney or by agents of the state in connection with the investigation or prosecution of the case; or of the statements made by witnesses or prospective witnesses, other than the defendant, to the district attorney, or to agents of the state." The exceptions to this article entitle defendant to specific statements and tangible evidence, but not access to the entire file.