444 So.2d 1196 (1984)
STATE of Louisiana
v.
Ronald J. PHILLIPS and Tommy B. Simmons.
No. 82-KA-1697.
Supreme Court of Louisiana.
January 16, 1984.
*1197 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., William R. Campbell, Jr., Michael Simpson, Jeffrey Raines, Asst. Dist. Attys., for plaintiff-appellee.
Numa V. Bertel, Jr., Maurice Hattier, Orleans Indigent Defender Program, New Orleans, for defendants-appellants.
LEMMON, Justice[*].
In a joint trial, defendants were convicted of the armed robbery of a neighborhood grocery store.[1] Both defendants appealed. The principal issues on appeal are (1) whether defendant Simmons' right to remain silent was "scrupulously honored" by law enforcement officers after Simmons initially invoked that right and (2) whether Simmons' statement was coerced by his employer, who was also a volunteer reserve police officer.[2]
Defendants committed the robbery with a sawed-off shotgun and fled in a brown colored van. From the license number furnished by a witness, the police traced the van to a construction firm which was engaged in a renovation project near the site of the robbery.
Further investigation revealed that defendants (who fit the description of the robbers) were employed by the construction company and that the van was assigned to Simmons on a 24-hour basis, since he was the foreman of the construction crew. Eventually, the police conducted photographic lineups, and several witnesses positively identified defendants as the robbers.
After the identification by witnesses to the crime, Simmons was arrested and taken to the police station, where he was advised of his rights. At that time, Simmons elected to exercise his right to remain silent, and the police officers respected his request and made no further effort to question him. Simmons was placed in jail.
On the following day, Simmons' employers, Faucheaux and Brooks, visited Simmons at the jail. Faucheaux testified that Simmons was a "key employee", whom he considered to be trustworthy and honest.[3] He did not believe that Simmons *1198 was the perpetrator of the robbery, and he speculated that Simmons was trying to protect another person whom Simmons had permitted to use the van. Without any suggestion or urging by the investigating detectives, Faucheaux and Brooks went to the jail on their own and encouraged Simmons to tell the officers what he knew about the robbery, all the while believing Simmons to be "totally innocent".
According to Faucheaux, Simmons agreed, after a few minutes of conversation and without disclosing to Faucheaux what he was going to tell the officers, that he should reveal what he knew. Faucheaux then advised the policemen on duty that Simmons wanted to speak with the officers who were conducting the investigation. When the detectives arrived about 15 minutes after being contacted by radio, Simmons immediately said that he wanted to talk to them about the robbery. One of the detectives stopped him and rewarned him of his right to remain silent and his right to the presence of counsel. After determining that Simmons understood his rights and wanted to speak without the presence of counsel, the detectives questioned Simmons about the robbery.
To Faucheaux's surprise, Simmons admitted that he and Phillips had gone together in the company van to the grocery store. However, Simmons claimed to have been unaware that Phillips planned to rob the store until Phillips produced the gun and pointed it at the cashier. Simmons stated that Phillips instructed him to take the money from the cash register and that he did so, after which they fled from the store in the van.
Although Simmons also testified at trial and denied that he participated in the robbery and that he ever admitted any participation, the jury obviously rejected his testimony, and the evidence fully supports that credibility determination.[4] Furthermore, the evidence introduced by the state at the trial and at the motion to suppress the statement clearly established that Simmons' statement was given voluntarily with full awareness and understanding of his rights. The sole remaining question, therefore, is the effect of Simmons' earlier invocation of his right to remain silent upon his subsequent statement. See Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Compare Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). See also State v. Loyd, 425 So.2d 710 (La.1982).
Several factors lead us to this conclusion that the officers did scrupulously honor defendant's right to terminate questioning by invoking his right to silence.[5]
*1199 When Simmons invoked his right to silence shortly after his arrest, the officers immediately terminated their efforts to interrogate him. Thus, Simmons knew that he was free to choose silence over speech if he believed that course best served his interests. Not until the following day did anyone approach him concerning the case. The police resumed questioning then, according to the testimony of witnesses found credible by the jury, only upon Simmons' request and after again advising him of his right to remain silent and his right to the presence of an attorney.
Although Simmons places great emphasis on Faucheaux's status as a volunteer reserve police officer, that fact is not of controlling significance.[6] When Faucheaux and Brooks (who had no connection, volunteer or otherwise, with the police) encouraged Simmons to cooperate, they did not do so as agents of the investigating officers, but rather as business associates who were acting in what they believed to be Simmons' best interest. Thus, this case does not involve a "team effort" to break Simmons' will to resist his interrogators' entreaties to make a statement.
The credible evidence established that Simmons' decision to speak (rather than to remain silent) was in no way coerced by Faucheaux, but was the product of Simmons' own choice as to the best course to follow in his own best interest. This is evident from the fact that Simmons told the officers immediately upon seeing them, after talking to Faucheaux and Brooks, that he wanted to talk to them about the robbery. The officers' rewarning Simmons of his rights before conducting the second interview served to remind Simmons that the choice between speech and silence was his alone.
Simmons' other contention is that the trial judge erred in excluding, as hearsay, his own testimony by which he attempted to explain the threats and inducements made by the police.
The trial judge did erroneously rule, on a couple of occasions, that Simmons could not testify as to statements allegedly made by officers to him. Although the testimony was admissible to prove that such alleged statements were in fact made by the officers (for the purpose of showing their effect on Simmons' state of mind), Simmons was not effectively denied an opportunity to portray, in his overall testimony before the jury, his version of the interrogation sessions. Significantly, Simmons denied making any inculpatory admissions to the police and disclaimed making any of the oral admissions of involvement attributed to him. Therefore, even if some of the trial court's rulings on this point were erroneous, the error was harmless beyond *1200 a reasonable doubt. See State v. Gibson, 391 So.2d 421 (La.1980).
Accordingly, defendants' convictions and sentences are affirmed.
NOTES
[*] Bailes, J., sitting for Marcus, Justice.
[1] Both defendants were adjudicated to be multiple offenders. Simmons was sentenced to 30 years imprisonment at hard labor. Phillips was sentenced to 60 years imprisonment at hard labor.
[2] Defendant Phillips did not file any assignments of error. Instead, defense counsel argued that the convictions of both defendants should be reversed, since Simmons' allegedly coerced statement led to Phillips' arrest and conviction. For the reasons which follow, we conclude that Simmons' statement was not coerced. Furthermore, the circumstances of this case do not give Phillips standing to assert this issue. See State v. Burdgess, 434 So.2d 1062 (La.1983).
[3] This recitation of facts and circumstances surrounding Simmons' statement is taken from Faucheaux's testimony at trial. The issues raised by Simmons on appeal were addressed only briefly at the pretrial hearing on the motion to suppress, at which the investigating officer testified that Simmons, on the day after the arrest, made an inculpatory statement after advice of his rights and without threats, coercion or promises. (The other evidence at the motion hearing focused on Phillips' contention that he was struck once on the chest during questioning after his arrest; however, Phillips denied that he had made the statement sought to be suppressed.)

Thus, the issues raised by Simmons on appeal primarily involve the evidence introduced at trial. Nevertheless, an appellate court, in reviewing a trial court's denial of a motion to suppress, may review not only the evidence contained in the record of the motion hearing, but also the evidence presented at the trial on the merits. See State v. Dunbar, 356 So.2d 956 (La.1978).
[4] At the trial, Simmons admitted that Faucheaux had visited him at the jail and that he had agreed to speak to the police, but denied that he made any inculpatory statement whatsoever.
[5] In Michigan v. Mosley, above, the Court evaluated the factual circumstances surrounding defendant's subsequent interrogation to determine whether law enforcement officers "scrupulously honored" defendant's right to silence. This court, in a thorough opinion by Justice Dennis in State v. Loyd, above, discussed this issue:

"Subsequently, the high court observed that the critical safeguard identified in this passage is a person's right to cut off questioning. Although the passage could be read to mean that a person who has invoked his right to silence can never again be subjected to custodial interrogation, or interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite, the court chose a middle course. It concluded that the admissibility of statements obtained after the person in custody has decided to remain silent depends on whether his `right to cut off questioning' was `scrupulously honored.' Through the exercise of his option to terminate questioning, he can control the time of when questioning occurs, the subjects discussed, and the duration of questioning. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.
"The restraints placed upon the interrogator when the suspect invokes his right to silence are to be contrasted with the more stringent safeguard called forth by his request for an attorney. In Edwards v. Arizona, 451 U.S. 477 [101 S.Ct. 1880, 68 L.Ed.2d 378] (1980), the high court expressly held that an accused, `having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'
"Consequently, when the accused invokes his right to silence, Miranda does not erect a complete bar to further police initiative in communications as it does after a request for an attorney. Nevertheless, the police must scrupulously honor the right to cut off questioning by the person in custody. Apparently, courts must look to the facts of each case and the precepts underlying Miranda to determine if the police engaged in conduct in obtaining a confession which destroyed the accused's confidence in his right to cut off questioning."
This case, like Loyd, involves invocation only of the right of silence, and not of the right to counsel. Defense counsel does not suggest that Simmons ever made a request for counsel to the police. Moreover, contrary to counsel's assertions in brief, neither Simmons nor Faucheaux testified that Simmons asked Faucheaux to obtain a lawyer for him.
[6] Faucheaux's duties as a reserve officer were to help with crowd control for special events, to assist in directing traffic, and the like. He worked 24 to 32 hours per month on a volunteer basis.