767 So.2d 839 (2000)
STATE of Louisiana
v.
Tyrone CARTER.
No. 00-KA-145.
Court of Appeal of Louisiana, Fifth Circuit.
July 25, 2000.
Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Allison Wallis, Nancy Miller, George Wallace, Jr., Assistant District Attorneys, Gretna, Louisiana, Attorneys for Plaintiff/Appellee.
*840 Bertha M. Hillman, Louisiana Appellate Project, Thibodaux, Louisiana, Attorney for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., SOL GOTHARD and MADELINE JASMINE, Pro Tempore.
GOTHARD, Judge.
Defendant, Tyrone Carter, appeals his conviction and sentence on a charge of the second degree murder of Shonette McPherson. For reasons that follow, we affirm.
The facts show that Ms. McPherson did not return home on Thanksgiving night in 1997. Efforts by family members to contact Ms. McPherson on her pager were unsuccessful. With growing concern, relatives of the victim notified police that she was missing. Investigation of the incident showed that defendant was the last person with whom Ms. McPherson was seen. Defendant called police after seeing a report of Ms. McPherson's disappearance on the news. Defendant told police he had not seen the victim since Thanksgiving evening at about 5:30 p.m., at which time they had an argument and went their separate ways.
A few days later police discovered the burned remains of the victim's vehicle in a desolate section of New Orleans East. A melted Rubbermaid gasoline can was recovered from the floorboard on the passenger side of the car. Nearby, the officers recovered a blue cigarette lighter. A search of the area for some trace of the victim was unsuccessful.
Because the officers had information that defendant was seen driving the victim's car on Thanksgiving night, he was called in for questioning. Defendant had what appeared to be burns on his hands. When officers inquired about defendant's injuries, he stated that he assisted someone who ran out of gas, by pouring gasoline into the vehicle. The individual lit a cigarette and threw the match at defendant. Defendant was released after the interview.
Ms. McPherson's body was found on New Year's Eve. An autopsy revealed that the cause of death was any one of three gun shot wounds. The victim was shot in the head, neck and chest. One of the three bullets remained in the body.
Defendant made several statements to the police. Initially, defendant maintained that he last saw the victim on Thanksgiving Day when she left him to walk in the Fischer Project. He later recanted that statement and admitted he killed her, dumped the body, and set fire to the car.
In one statement, defendant first told police that he and the victim were engaged. He said he picked the victim up at about 4:00 p.m on Thanksgiving Day. The couple rode around and she told him she thought she might be pregnant, which angered him. At about that time, Ms. McPherson's pager went off. When the defendant asked who called, Ms. McPherson replied that it was "nobody". Defendant drove to the Circle K and called the number indicated as the calling number on the pager. He spoke to "Gerald" who informed the defendant that he had an intimate relationship with Ms. McPherson. Defendant asked Ms. McPherson to speak to Gerald, but she only smiled and walked away. Defendant went after her but she refused to get into the car and threatened to yell "rape" if he continued.
Defendant stated that he left and later went to a movie with "Darlene". Then he went to deliver a vehicle to a friend. After he dropped off the vehicle, he was taken to the Circle K about 1:00 a.m. He assisted someone who ran out of gas and burned his hands. Another friend, "Monica", picked him up at the Circle K. Later he went to Charity Hospital for treatment of the burns.
Subsequently, on December 30, 1997, defendant told police he would bring them to Ms. McPherson. In the next statement given shortly afterward, he admitted killing *841 her with a 357 magnum he intended to use for suicide. Ms. McPherson grabbed the gun from him twice in an attempt to prevent him from killing himself. When defendant tried once again to kill himself, Ms. McPherson attempted to prevent him and the gun went off six times. In a subsequent statement he admitted to burning the car.
After the statements, defendant was charged with Ms. McPherson's murder. He plead not guilty at his arraignment, after which he filed a motion to suppress all confessions. On November 12, 1998, the motion was partially heard in order to perpetuate the testimony of Willard Hill, a local attorney. Additional hearings on the suppression motion were held on July 9, August 9, and August 12, 1999. On August 17, 1999, the trial court denied the motion to suppress the statements. Subsequently, the state filed written notice of its intent to use oral statements made by the defendant and other witnesses at trial.
On August 31, September 1, and September 2, 1999, a trial on the merits was conducted, after which a twelve person jury found the defendant guilty as charged. Defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On the same day, defendant timely filed a written motion for appeal.
The only issue for review on appeal is whether the trial court erred in its denial of the motion to suppress the statements. Defendant's arguments concern the issue of whether various statements were given at a critical stage which triggered the right to counsel, and whether the statements were taken in violation of his right to counsel.
Although defendant made several statements to police, his arguments herein concern the statements given to Lieutenant Pernia and Colonel Gorman, wherein defendant confessed to the crime, after he allegedly invoked his right to counsel. Although he also gave previous statements to Detective Lawrence denying culpability, these were given before he consulted an attorney and do not appear to be at issue.
In connection with the motion to suppress the confession, testimony of local attorney, Willard Hill, was perpetuated on November 12, 1998. At that time Mr. Hill testified that the defendant, a former client, approached Mr. Hill when defendant had not yet been formally charged with any crime. Defendant was concerned that the police had questioned and released him three times and he was having difficulty getting employment because of the interrogation. He was also having difficulty with his girlfriend's family. Around the first of December, 1997, Mr. Hill spoke to the police officer identified by defendant as the person who questioned him. The conversation was unpleasant. Mr. Hill called a supervisor and said that he would be representing defendant. However, at that time there were no charges pending against defendant.
Mr. Hill further testified that from mid-December until mid-January, 1997, he was out of the office tending to a family crisis. About a week after the first contact with the police officers, Mr. Hill received a second call. He was informed that defendant was about to be arrested. The officers wanted to know if Mr. Hill could contact defendant. Mr. Hill replied that if he heard from defendant he would convince him to come in to police headquarters. Mr. Hill subsequently received a letter from police offering the same information.
On further questioning, Mr. Hill testified that there was no written contract of representation. He stated that "we hadn't gotten to that point yet". Mr. Hill considered defendant a client because he had represented defendant in a different case several years before. The only action he took on defendant's behalf in the case at bar was the conversation with police officers before defendant was charged with a crime, and a conversation with a reporter from the newspaper.
*842 On July 9, 1999, the court heard testimony on the motion to suppress from Colonel Walter Gorman, the commander of the crimes against persons section of the criminal investigations division in Jefferson Parish. He testified that he assisted the Gretna Police Department in the investigation of the disappearance of Shonette McPherson. He was aware that Mr. Hill had some contact with the Gretna Police Department, but understood that Mr. Hill was not representing the defendant. Colonel Gorman placed phone calls to Mr. Hill's office on two occasions, leaving messages both times. He also sent a registered letter. However, there was no response from Mr. Hill.
Colonel Gorman went to see defendant in the Jefferson Parish Correctional Center to tell defendant that efforts to reach Mr. Hill were unsuccessful. At that time Colonel Gorman ask defendant if Mr. Hill was his attorney. The defendant responded that Mr. Hill had represented him previously in another matter, and that defendant had consulted Mr. Hill before any charges were brought against him. However, defendant stated that he was unclear about the status because Mr. Hill had not been in touch with him. Defendant had been unable to reach Mr. Hill and defendant was unsure whether Mr. Hill was going to represent him in this matter. Defendant indicated to Colonel Gorman that he wished to cooperate with police to help find Ms. McPherson.
On August 9, 1999, the court heard testimony from Detective Wayne Lawrence, who testified that Mr. Hill contacted him to find out why the detective wanted to talk to the defendant again. According to the detective, he asked Mr. Hill if he was defendant's attorney and Mr. Hill replied that he was not. Mr. Hill explained that defendant was only at his office for a consultation.
Detective Lawrence testified he did not provide information to Mr. Hill because he was not representing defendant. After the detective obtained a warrant for the arson and auto theft, he called Mr. Hill and asked him if the defendant would turn himself in. At that time, Mr. Hill said he had not seen defendant since he last spoke to the detective. The detective gave Mr. Hill defendant's pager number because Mr. Hill did not know how to reach defendant. During that conversation Mr. Hill denied that he represented the defendant. Mr. Hill told the detective there was no agreement on the fee for representation. There was no further contact between Mr. Hill and Detective Lawrence, although the detective tried unsuccessfully several times to contact Mr. Hill in mid-December when warrants were issued for defendant's arrest.
On August 12, 1999, Mr. Hill again testified on the motion to suppress. At that time he stated that he called the detective to find out the defendant's status. He admitted he could not remember if he specifically told the officer he was representing defendant. Mr. Hill said that he usually says that he will be representing a client in such situations. He said that he "communicated the spirit of representing a client to this officer". He had a five minute conversation which was unhelpful because the detective was uncooperative. When Mr. Hill ended the conversation he called a supervisor to file a complaint. He again admitted that he had no retainer agreement with defendant. Defendant's mother came to Mr. Hill's office some time in December and said that she had no money so she could not hire him. Subsequently, defendant called Mr. Hill from jail in mid-January, and Mr. Hill told defendant that he could no longer represent him. Mr. Hill explained that a family crisis and his own illness prevented him from communicating the end of the representation to defendant earlier.
The court concluded it was not persuaded that Mr. Hill had an attorney/client relationship and noted inconsistencies in Mr. Hill's testimony in that regard. The trial judge found defendant had the opportunity to remain silent, that defendant was *843 reminded of Mr. Hill's possible availability and despite that, he wanted to speak. The trial judge found the confession voluntary. He found defendant intelligently and voluntarily waived his rights to have an attorney present at the questioning. The trial judge concluded defendant wanted to tell his story.
Evidence on the suppression motion was adduced at the hearing and at trial. In determining whether the ruling on defendant's motion to suppress was correct, the court is not limited to the evidence adduced at the hearing on the motion, but may consider all pertinent evidence given at the trial of the case. State v. Chopin, 372 So.2d 1222, 1223 (La.1979).
Colonel Gorman and Lieutenant Snow questioned defendant on two separate days; namely, December 31, 1997 and January 2, 1998. On December 31, defendant was questioned continuously from 4:21 p.m. to 6:58 p.m. At the beginning of questioning, defendant was fully informed of his Miranda[1] rights. He indicated he understood them and waived them. He also stated he had an attorney and he understood that if he could not afford an attorney one would be appointed for him. He specifically stated that although his attorney might be upset with him for talking to the officers, he still wanted to do so. Defendant denied that any threats, coercion, or force was used, stating the officers spoke to him "nice."
When Colonel Gorman and Lieutenant Pernia first approached defendant, he was in jail on charges of arson and possession of a stolen vehicle, charges stemming from the discovery of the victim's car. Colonel Gorman testified that he and Lieutenant Pernia advised defendant of his rights at the jail and at the investigation bureau where defendant was taken for questioning. When the officers went over the waiver form, defendant stated he was uncomfortable with reading his rights, indicating that Ms. McPherson was in the process of teaching him to read. It was for this reason that defendant's rights were recorded rather than having him sign the written form.
Colonel Gorman testified that at the time of the initial contact, there was no indication a crime had been committed and defendant was not a suspect, but only a party of interest in the missing person investigation. Nevertheless, the officer gave defendant his rights out of an abundance of caution since defendant was charged with other crimes. In State v. Weeks, 345 So.2d 26, 28 (La.1977), the court explained that Miranda warnings must be given where the investigation of a crime has passed the investigatory stage and focused on the accused. The January 2 statements were clearly taken after defendant confessed his guilt for the instant offense. Defendant asserts that Colonel Gorman refused to admit defendant was a suspect during the initial questioning, referring to defendant only as a person of interest. It is of no moment whether Miranda warnings were required for both sessions since it appears from the record that the warnings were given on both dates.
After the first statement was taken on December 31, there was a gap of approximately one-and-one-half hours. Colonel Gorman testified that Lieutenant Pernia left the room and he, Colonel Gorman, sat with defendant and talked. Defendant spoke about his relationship with Ms. McPherson and then informed Colonel Gorman he had something to say. Defendant asked if Colonel Gorman wanted to call Lieutenant Pernia, and Colonel Gorman agreed. Lieutenant Pernia entered the room. When questioning resumed, defendant was reminded of the previously explained rights. He was specifically reminded that he had an attorney and a right to have that attorney present. Defendant was asked, "Do you wish to tell us something at this point, without your attorney present?" Defendant said, "yeah." *844 The next questioning took place twenty-four minutes later. At that point, defendant was again reminded of his rights. He was specifically advised of his right to remain silent and his right to an attorney. He was reminded that he had an attorney, but he agreed to speak to the officers. He denied that any pressure, threats, or coercion were used. The next questioning occurred approximately one hour later, after defendant showed police the location of the victim's body. Defendant denied that any force was used on him to get him to show the location or to do anything he did that night.
On January 2, 1998, the first statement was taken at 4:39 p.m. to 4:58 p.m. Defendant was fully advised of his Miranda rights, stated he understood them, and waived them. He stated he felt comfortable with the officers. He agreed that he contacted "Monica" the day of the interview, and asked her to tell Lieutenant Snow and Colonel Gorman he wanted to talk to them that day. The next statement was taken at 6:42 p.m. more than an hour later. At that time defendant was given the Miranda rights. He indicated these were the same rights given to him the first day he spoke to the officers and, although he had an attorney, he did not want to wait for the attorney in order to give a statement.
At trial, Colonel Gorman testified that before starting any formal interviews he advised defendant of his Miranda rights. Colonel Gorman asked defendant if he was interested in having an attorney present, and defendant said he was not interested. The officers then went to the office and started a tape-recorded interview where defendant was again advised of his rights and was asked if he wanted an attorney present. Defendant stated he understood his rights and waived them. He wanted to talk to police without an attorney. The interview ended around 7:00 p.m. Colonel Gorman next spoke with defendant discussing background information on defendant's relationship with Ms. McPherson. Defendant then said he had something to say. Defendant suggested Colonel Gorman call Lieutenant Pernia back into the office so that she could hear. At the time, Lieutenant Pernia was making telephone calls. At the beginning of each formal statement, defendant was advised of his rights. After defendant gave a third statement admitting Ms. McPherson was dead and he was responsible, he agreed to take the officers to the body. Defendant directed the officers to the location. Before bringing them to the body, he pointed out the location where he killed her, which was in Jefferson Parish.
On January 2, 1998, a second set of interviews was conducted. This resulted because defendant indicated he wanted to speak to the officers. Defendant was again advised of his rights. He stated that he understood them and waived them. While he was at the location of the body, he gave another statement.
Lieutenant Pernia testified she was involved in the investigation. She began the participation on December 30, 1997. She participated in taking defendant's statements. She took defendant's statement at approximately 10:23 p.m. on December 31, 1997 at the location where he dumped Ms. McPherson's body. Defendant was in the car with Lieutenant Pernia at the time. Defendant indicated on the tape that he was not forced to go to that location.
Defendant argues that LSA-R.S. 15:451 requires the state to prove beyond a reasonable doubt that the confession was freely and voluntarily given. Citing State v. Benoit, 440 So.2d 129 (La.1983), he asserts that defendant must be able to understand the rights and to willingly give a statement. Defendant argues generally that in this case the totality of the circumstances indicate his confession was not free and voluntary, and the state failed to meet its burden since any waiver of the right to counsel was invalid in this case. Defendant does not specifically argue other factors negating the voluntariness of the confession *845 except the alleged invocation of the right to counsel.
We find from the record the confession was freely, voluntarily, knowingly, and intelligently made. However, the seminal issue is whether defendant's actions in consulting Mr. Hill, seeking his representation, and having Mr. Hill act on defendant's behalf by making telephone calls, constitutes defendant's invoking his right to counsel, thereby precluding interrogation. Although the thrust of defendant's argument below centered on the issue of whether Mr. Hill represented defendant, the proper question is whether defendant invoked his right to counsel.
Defendant argues that, because he was a suspect, his interrogation was a critical stage triggering the right to counsel. He asserts that under Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), the prohibition against questioning defendant without an express, knowing, intelligent and voluntary waiver by him exists automatically, and does not hinge on any assertion of rights by defendant. Further, he notes that despite Colonel Gorman's confusion as to whether Mr. Hill represented defendant, defendant invoked his right to counsel when he contacted Mr. Hill to represent him and had the attorney make three telephone calls on his behalf. These actions, according to defendant, constitute assertions and an invocation of the right to counsel. He also argues that once the right to counsel attached and defendant asserted his right to counsel, any subsequent waiver of rights pursuant to police-initiated interrogation was invalid pursuant to State v. Carter, 94-2859 (La.11/27/95), 664 So.2d 367. Additionally, he states that once defense counsel has made himself available, the police are required to grant counsel reasonable access to defendant under State v. Serrato, 424 So.2d 214, 221 (La.1982). In Serrato, the court held that if an identified attorney is available and seeking to render assistance, and the police neglect to inform defendant, any statement would be inadmissible.
The state argues that defendant never invoked his right to counsel, asserting that defendant's actions in contacting Mr. Hill to represent him and having Mr. Hill make three telephone calls on his behalf do not constitute invoking the right to counsel. Citing State v. Carter, supra, the state argues that after the right to counsel has attached, a suspect may waive his right to counsel during an interrogation, provided the waiver is knowing, voluntary, and intelligent. Further, the state adds the Carter court cited with approval Michigan v. Harvey, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990), for the proposition that nothing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing of his own to speak with police in the absence of an attorney. The state asserts that defendant's understanding of State v. Serrato, supra, is erroneous since in that case, unlike the case at bar, the police denied the attorney access to his client while they continued to question defendant.
The state argues that in this case defendant agreed to come to the detective bureau before he was arrested for the instant offense. Defendant initiated contact with the police by having someone inform the police that defendant wished to speak to them again. The state asserts, and we agree, it is not disputed that the police informed defendant of his Miranda rights. Further, it has never been contended that defendant informed the police that he wished to have counsel present for any further questioning. It has also never been contended that Mr. Hill sought to confer with his potential client before defendant spoke to the police. Defendant's sole complaint is that Mr. Hill might in some sense represent defendant, and that therefore the police should have stopped all questioning of defendant because of the mere fact that defendant had a consultation with him.
*846 The state asserts that neither federal nor state law adopts this expansive view of enforcing the Sixth Amendment. The state notes that defendant validly waved his Miranda rights and his right to counsel. Whether the interviews with the police were critical stages of the proceedings, and whether defendant wished Mr. Hill to represent him does not resolve the correctness of the decision to admit defendant's confession, since defendant never invoked his right to counsel.
In State v. Loyd, 425 So.2d 710, 716 (La.1982) (pre-trial rulings, Loyd I), conviction affirmed, sentence vacated, case remanded, State v. Loyd (Loyd II), 459 So.2d 498, 504-506 (La.1984) (quoting Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981)), the Louisiana Supreme Court explained:
The restraints placed upon the interrogator when the suspect invokes his right to silence are to be contrasted with the more stringent safeguard called forth by his request for an attorney. In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the high court expressly held that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."
In State v. Campbell, 94-1140, 673 So.2d 1061, 1068 (La.App. 3 Cir. 3/13/96), writ denied, 96-1785 (La.1/10/97), 685 So.2d 140, reversed on other grounds, Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998), the court considered the argument made by defendant that once an attorney was appointed for him, the sole contact should be through counsel. The court explained:
[in comparing the case to] Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), in which the United States Supreme Court held that even when an attorney had been contacted by a defendant's family member without the defendant's knowledge, and the attorney was hindered in his attempt to meet with the defendant by law enforcement, the defendant's confession was still admissible assuming a valid waiver. In reaching this conclusion, the Supreme Court specifically found that the prosecution had not yet commenced and therefore, the defendant's Sixth Amendment rights had not yet attached.
Although an attorney was appointed for the defendant as part of the arrest warrant and the defendant was informed of his right to have an attorney appointed, neither Chief Deshotel nor Deputy Aucoin informed the defendant that an attorney had been appointed. Defendant contends that, once a defendant has an attorney, "the sole contact between the state and the defendant should be through the defendant's counsel." We do not find that the protection of the defendant's Sixth Amendment rights requires such a procedure. See State v. Carter, 94-2859 (La.11/27/95); 664 So.2d 367.
Therefore, we do not find that the defendant's Sixth Amendment right to counsel has been violated in that it had not yet attached when the spontaneous inculpatory statements were made. Even assuming for argument that his right had attached, we still find that, based on the decision in Carter, his right has not been violated.
In the instant case, even assuming defendant's Sixth Amendment right attached, under State v. Carter, supra, 94-2859, 664 So.2d at 382, the right to counsel could still be waived. The Carter court held:
Therefore, we conclude the right to counsel under Art. I, Sec. 13 of our constitution and the right to counsel under the Sixth Amendment are coextensive in scope, operation, and application. The Sixth Amendment jurisprudence predating our state constitution, as well *847 as later U.S. Supreme Court decisions explaining those cases, make clear that a defendant can validly waive his Sixth Amendment right to counsel under certain circumstances. We hold the same principle applies to the right to counsel under La. Const. Art. I, Sec. 13. Because our constitution can give no less protection than is afforded by the United States Constitution, we are additionally bound by the Court's holding in Michigan v. Jackson [475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)], that once defendant's right to counsel has attached, if he makes an assertion or invocation of this right, any waiver he would later make in response to police-initiated interrogation will be considered invalid, regardless of whether the waiver would normally meet the standards of a knowing, intelligent and voluntary waiver. Where defendant's right to counsel has attached but he has not made an assertion or invocation of his right to counsel, a waiver in response to police-initiated interrogation can be considered valid provided it is knowing, intelligent and voluntary.
(Footnote omitted)
In State v. Hattaway, 621 So.2d 796, 798 (La.1993), overruled in part, State v. Carter, 94-2859 (La.11/27/95), 664 So.2d 367, questioned, State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, the Louisiana Supreme Court previously concluded the state violated defendant's right to counsel when it unlawfully removed him from the trial venue without notice to his appointed counsel or to the trial court. Under these circumstances the state could not obtain a valid waiver or communicate with defendant except through the medium of defense counsel. The Louisiana Supreme Court held that once adversarial proceedings began, and counsel had been appointed, defendant was entitled to counsel under the Sixth Amendment of the United States Constitution and Article 1, Section 13 of the Louisiana State Constitution. State v. Hattaway, supra, 621 So.2d at 814. However, in State v. Carter, supra, 94-2859, 664 So.2d at 374, the Louisiana Supreme Court overruled State v. Hattaway, supra, in part insofar as it applied to overt as opposed to covert interrogation, thereby distinguishing the type of interrogation.
The record discloses the interrogation in the instant case was overt. Colonel Gorman testified he made several attempts to contact Mr. Hill. Mr. Hill did not leave any instructions that defendant not be questioned. If counsel alerts police officers to the representation and instructs the officers that defendant is not to be interrogated, police officers may not initiate questioning or breach this request. State v. Trevathan, 414 So.2d 316, 319 (La.1982). In that case retained counsel instructed police not to interrogate defendant without the presence of an attorney. The court held there was no valid waiver of defendant's right to the assistance of counsel where police ignored the instruction. Compare, State v. Dixon, 527 So.2d 401, 402-403 (La. App. 4 Cir.1988), writ denied, 537 So.2d 1158 (La.1989), wherein a lawyer was sent by defendant's mother to the police station to inquire as to why defendant had been asked for an interview. The testimony was conflicting as to whether the attorney was acting as a friend or in a representative capacity. Defendant was subsequently questioned and waived Miranda rights. Defendant argued the police should not have questioned him without first contacting his attorney. The court accepted the trial judge's finding that the attorney was acting in a representational capacity and held that defendant never invoked his right to counsel. It further found the confession was freely, voluntarily, knowingly, and intelligently made.
Here, defendant was given the opportunity to wait for Mr. Hill's appearance and chose not to do so. It appears evident that defendant wanted to confess, having also confessed to "Monica" and his mother.
*848 In State v. Serrato, supra, 424 So.2d at 220-221, the court held that police officers must grant defendant reasonable access to counsel once counsel is available, and that defendant must be informed that he has a lawyer seeking to aid him. In the instant case, the audio-taped interview and the testimony appear to indicate that defendant was never denied access to counsel, and instead was reminded of Mr. Hill's presence.
In an earlier Louisiana Supreme Court case, consistent with State v. Carter, supra, the court held that when defendant knows an attorney has been hired or appointed, he can still waive counsel's presence. State v. Harper, 430 So.2d 627, 634 (La.1983). In that case, defendant was present in court when counsel was appointed. Before giving a statement, he was informed he was free to consult with his attorney before making statements and that he could end the interview at any time. The fact that defendant had an attorney, with whom he had not conferred, did not prevent police from getting a statement from defendant without prior notice to, or consent of, the attorney. Defendant could still waive his Sixth Amendment right to legal representation after the commencement of adversarial proceedings. We believe in this case defendant did just that. Accordingly, we find no merit in this argument.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La. App. 5 Cir.1990). In that review we find that defendant was not informed of the prescriptive period for filing post-conviction relief.
At the time of sentencing, LSA-C.Cr.P. art. 930.8 provided for a two-year prescriptive period.[2] The trial court is hereby ordered to inform defendant of the provisions of Article 930.8 by sending appropriate written notice to defendant within ten days of the rendition of this court's opinion and to file written proof in the record that defendant received the notice. State v. McIntyre, 97-876 (La.App. 5 Cir. 1/27/98), 708 So.2d 1071, 1076, writ denied, 98-1032, (La.9/18/98), 724 So.2d 753.
For the foregoing reasons the defendant's conviction and sentence are affirmed.
AFFIRMED WITH ORDER.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 444-445, 86 S.Ct., 1602, 1612, 16 L.Ed.2d 694 (1966).
[2] 1999 La. Acts No. 1262, effective August 15, 1999.