KNOLL, Justice.*
1 tThis criminal case, which is in a pretrial posture, concerns the production of the witnesses for an in camera interview. Specifically, the issue is whether the District Court erred in ordering the State produce the witnesses for an in camera interview to advise the witnesses of their *1265 right to speak with defense counsel and ensure they do not possess exculpatory information, which has not yet been disclosed by the State. Defendants, Sullivan and Bernard Harper, were each charged by bill of information with violating two counts of La.Rev.Stat. § 14:27 and La.Rev. Stat. § 14:30, relative to the attempted first-degree murder of Ferd Edgar and Chavis Williams. Through discovery, defense counsel sought the correct addresses and phone numbers of two allegedly exculpatory witnesses for the purpose of locating and interviewing the witnesses. In the alternative, the defense requested the District Court conduct an in camera examination. The District Court granted defendant’s request in the alternative, ordering the State produce the witnesses for an in camera interview with the court. In its writ denial, the Court of Appeal found no abuse of the District Court’s discretion. We granted this writ to address the correctness vel non 12of the lower courts’ rulings. State v. Harper, 10-356 (La.6/18/10), 38 So.3d 312.[1] For the following reasons, we reverse the judgment of the Court of Appeal, finding the District Court abused its discretion in ordering a pre-trial in camera interview with the witnesses under the circumstances herein.
FACTS AND PROCEDURAL HISTORY[2]
On May 25, 2009, around 1:58 a.m., Edgar, Williams, and Jerome Suggs, along with several female friends, were standing at the intersection of Conti Street and Bourbon Street in front of the Famous Door Lounge in the French Quarter when defendants, along with their brother, Raymond, and another black male, walked through their group, “bumping into everyone.” A verbal altercation then ensued, which became physical when Bernard was struck by a member of the victims’ group. Stating “we’ll be back, we got something for ya’ll,” the defendants fled on Bourbon Street towards Canal Street, making gun-like gestures with their hands as they departed.
Concerned defendants would return, the victims hailed a taxi from a nearby taxi stand for their female companions. While helping the women into the vehicle, Edgar observed Bernard emerge from the Bourbon Street crowd, pulling a silver and black handgun from the waistband of his pants. As Bernard approached the driver’s side of the taxi, the driver fled the intersection, leaving Edgar exposed. Bernard then began firing on Edgar, who was struck a total of seven times in the area of his left leg and hip.[3] Although Edgar tried, he was unable to draw his weapon. At some point |a during the shootout, both Sullivan and Williams[4] joined the affray. According to his statement, Suggs retrieved Edgar’s gun and began shooting at *1266 defendants as well.[5] Defendants then fled the scene, running down Conti Street towards Rampart Street.
Officers Joseph Jefferson and Larry Adams were on patrol in the area of Dau-phine Street and Conti Street when they heard the first round of gunshots coming from Conti Street and Bourbon Street. Running towards the sound up Conti Street, the officers observed Bernard “crouched down with his arm extended toward the intersection of Bourbon and Conti,” dropping something and “kind of making a turning movement like a simultaneous turning to run movement.” Raymond was ahead of him running towards the approaching officers.[6] As Officer Jefferson identified himself, a second round of gunshots sounded, and Bernard fell to the ground, screaming he was hit. Bernard sustained a gunshot wound to his left arm. According to Officer Jefferson, both Bernard and Raymond were wearing black T-shirts when they were apprehended.
As Officer Adams continued towards Bourbon Street, Sullivan approached and advised the officer he had observed “a heavy build, black male, wearing a blue shirt,” later identified as Williams, as one of the shooters. Once detained, Williams alerted Officer Adams that Sullivan was the shooter, at which time Sullivan was apprehended.[7]
|4New Orleans Emergency Medical Services were then summoned to the location, and both Bernard and Edgar were transported to University Hospital. En route to the hospital, Edgar advised Officer K. Perkins the individual next to him, Bernard, was the individual, who shot him. Witnesses on the scene positively identified Bernard and Sullivan as the two individuals who shot Edgar. Bernard and Sullivan were subsequently arrested on the charges of attempted first-degree murder.
Pertinent to the issue in this case, Officer Jefferson took the written statements of two witnesses, Timothy Perry and Susan Glatt. Perry’s unedited statement provided:
I was in the upstairs office in the Famous Door when I heard gun fire errupt[erupt] outside. I ran to the window that over-looks Conti St. and I saw 2 black males who looked to be around the age of between 18 + 25 taking their final shots in the direction of Bourbon St. They then fled on foot down Conti St. toward Rampart.
They were wearing long white T-shirts and dark colored jeans. There was height difference between the two shooters: 1 appeared to be around 6'1", slender and the other around 5'9" or *1267 5'10"[8] and slender as well.
The sound of the weapons being fired sounded different; one sounded like a 9 mm and the other, deeper, probably a 45.
There was a black female near the shooters running towards Bourbon St. trying to escape the incident.
Susan Glatt’s unedited statement stated:
Two black male. One had a white T-shirt on shooting towards Conti Street both running towards Rampart both had short hair one might of had a dark shirt on with dark jeans. I did not see too much after that. It happen so fast really can’t be much of that help.
Both of them where shooting towards rampart one might of shot towards Bourbon but running towards rampart.
ROn August 3, 2009, defendants appeared for arraignment and entered dual pleas of not guilty. Defendants subsequently filed motions to suppress evidence, identification, and confessions/statements, motion for production of the police/sheriff incident report of the investigation, motion for discovery and inspection, and motion for disclosure of impeaching information. On August 19, 2009, the State filed its answers to defendants’ motions. In its discovery materials turned over to the defense, the State included the New Orleans Police Department Incident Report, which contained the written statements of Perry and Glatt, as well as the witnesses’ RAP sheets.
On August 24, 2009, defendants filed a Motion for Issuance of Subpoenas to have the victims and lay witnesses subpoenaed to appear in court for an interview with the defense.[9] In response, on September 15, 2009, the State filed a Motion to Prohibit Victims and Witnesses from Being Compelled to Testify at any Pre-trial Hearings and subsequently a Motion to Quash Subpoenas. On November 12, 2009, the District Court granted the State’s motion to quash.
On December 4, 2009, the defendants filed a Motion for Disclosure of all Brady[10] Material, seeking “[a]ny and all statements of Timothy Perry and Susan Glatt that are exculpatory in nature as to the defendant, Bernard Harper” and their addresses and phone numbers. The defense explained:
The police report clearly reflects that Timothy Perry’s testimony will be exculpatory to the defendant, Bernard Harper. Timothy Perry described the shooters in this case as wearing white T-shirts. The defendant, Bernard Harper, was wearing a black T-shirt. In addition, the witness, Susan Glatt, also identified one of the shooters as wearing a white T-shirt and the other possibly wearing a dark T-shirt. The address and phone number of both witnesses has been excised in the police report to exclude from the defendant’s view the address, telephone number and | ^contact information for these two witnesses. These are not victims. They are exculpatory witnesses to the defendant, Bernard Harper. The State is intentionally withholding their addresses and phone numbers from the defendant. Undersigned counsel has requested these addresses previously and has been advised *1268 by the court that the State will make these witnesses available for trial. That is insufficient. The defendant has a right to investigate the case and interview these witnesses prior to trial. The court’s failure to order the State to provide the defendant with the addresses and phone numbers of these witnesses prevents the defendant from properly preparing for trial. It would be ineffective assistance of counsel for undersigned counsel not to interview these witnesses prior to calling them as witnesses in a trial. The State’s refusal to provide the defendant with the full address and phone number of these witnesses effectively prevents undersigned counsel from interviewing said witnesses prior to trial creates unnecessary uncertainty concerning their testimony.
Defendants again requested the addresses and phone numbers of Perry and Glatt in their Supplemental Memorandum in Support of Motion for Disclosure of all Brady Material filed on January 12, 2010, explaining:
The State does not have the right to deny the defendant an opportunity to speak to these exculpatory witnesses. If these witnesses do not want to speak to the defense then the defendant should hear that from the witnesses. The defendant should have the opportunity to speak to these witnesses without interference by the State. Previously the State indicated these witnesses do not wish to speak to the defense. The defense does not rely upon the State’s assertions. The defense would ask for the opportunity to speak to these witnesses well before trial or in the alternative would ask that the court conduct an in camera examination of these two exculpatory witnesses to determine whether or not they have an objection to speaking to the defense. (Emphasis added).
During the motion hearing held on January 28, 2010, the defense orally argued:
[TJhere are two witnesses who identified the individuals who were involved in the shooting were wearing different colored T-shirts than [Defendants] were wearing. And their names are in the Record. The State has — they are clearly exculpatory to the defense. I had asked for their contact information so that we could discuss it with them.... I believe that the address and phone numbers are Brady material.
The State, in turn, argued this information was not exculpatory because one of the witnesses fired back in self-defense and there were more than two shooters. The State further explained this information was not necessarily exculpatory evidence and 17the defense was mischaracter-izing the evidence.
On February 1, 2010, the State filed a Motion to Prohibit Witnesses from Being Compelled to Appear, and on February 3, 2010, the District Court rendered its written ruling:
The State has objected to the court’s order that they produce the victim and witness for an in camera interview by the court on February 19, 2010. The Court’s purpose in this interview is two fold: first, to verify that they have been advised of their right to speak to defense counsel, and second, that they do not have exculpatory information which has not yet been disclosed to defense counsel. At no time will the victim’s [sic] and witnesses be required to testify at a hearing, nor will they be confronted by defense counsel. This court will take every precaution to protect the witnesses in question. *1269 expressed concern over a description discrepancy inherent in the police reports and witness statements. It is these discrepancies that the defense would like to explore. The State argues that there is an explanation which may or may not be true, but is not readily apparent from the record as it stands right now. In order to protect everyone’s interest, this court feels the in camera interview is appropriate. This type of interview has been sanctioned by the Louisiana Supreme Court. State v. Golden, 95-0288 (La.2/17/95), 650 So.2d 237. Therefore, the State’s motion to prohibit the witnesses to appear is DENIED.
*1268 The State argues that the defense has not met any burden to justify this action by the court. However, the defense has
*1269 In an Amended Ruling, the District Court restricted “the in camera interviews to the witnesses only” and further explained the interviews were necessary “[b]ecause of conflicting claims by both sides, claims made at bench conferences and credibility issues from both sides.”
The Court of Appeal, Fourth Circuit, denied the State’s application for emergency supervisory writ and its request for a stay, reasoning:
We do not find the trial court abused its discretion in ordering a pre-trial in camera hearing with the witnesses and victim in this jury trial case set for 8 March 2010. As the Supreme Court recently stated:
The right of confrontation contained in the United States and the Louisiana Constitutions is not implicated in this pre-trial matter. See State v. Harris, 08-2117, p. 1 (La.12/19/08), 998 So.2d 55, 56. Moreover, the Louisiana Constitution protects the rights of victims of crime to refuse to be interviewed by the accused. La. IsConst. art. I, § 25. Accordingly, La. Rev.Stat. § 46:1844(0(3) provides that a defendant must show “good cause” at a contradictory hearing with the district attorney why a crime victim should be subpoenaed to testify at any pre-trial hearing.
State v. Taylor, 09-2341 (La.2/5/10), 26 So.3d 776.
In this case, unlike Taylor, it is the trial court, not the defendants or their counsel, that will be participating in the hearing. La. R.S. 46:1844 is not impacted because of the absence of the defendants or their counsel.
State v. Harper, 10-231, p. 1 (La.App. 4 Cir. 2/17/10).
LAW AND DISCUSSION
As the pleadings demonstrate, the core issue underlying this matter is whether the State is required by law to provide the defendants with the witnesses’ contact information during the discovery phase of the proceedings to aid defendants in locating and, in turn, interviewing allegedly exculpatory witnesses before trial. It logically follows, therefore, in resolving this issue, this Court must examine the constitutional duties of both the State and the defense, which arise under our adversarial system of criminal justice, namely the duty to disclose exculpatory evidence and the equally important duty to investigate, in order to determine whether the District Court superseded its authority as an impartial arbiter in ordering the production of the witnesses for an in camera interview.
In accordance with the due process clause of the Fourteenth Amendment to the United States Constitution, the State must disclose evidence which is favorable to the defense when “the evidence is material either to guilt or to punishment” or impeaches the testimony of a witness where “the ‘reliability [or credibility] of a given witness may well be determinative of guilt or innocence.’ ” Brady, 373 *1270 U.S. at 87, 83 S.Ct. at 1196-97; Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). “[E]vi-dence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); see also, State v. Rosiere, 488 So.2d 965, 970 (La.1986). “A ‘reasonable probability1 is a probability sufficient to undermine confidence in the outcome.” Bagley, 473 U.S. at 682, 105 S.Ct. at 3383; see also Rosiere, 488 So.2d at 970-71. Contrarily, “[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish ‘materiality’ in the constitutional sense.” United States v. Agwrs, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). “Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.” Bagley, 473 U.S. at 675, 105 S.Ct. at 3380. Significantly, because the prosecution “alone can know what is undisclosed,” it is “assigned the consequent responsibility to gauge the likely net effect of all such [favorable] evidence [unknown to the defense] and make disclosure when the point of ‘reasonable probability1 is reached.” Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995).
Except as expressly provided by statute, Louisiana law does not authorize the disclosure of reports, memorandums, or other internal state documents, which are made by the district attorney or agents of the State, nor is the defendant entitled to witnesses’ statements made to the district attorney or agents of the State. La.Code Crim. Proc. art. 723; State v. Cobb, 419 So.2d 1237, 1241 (La.1982); State v. Ates, 418 So.2d 1326, 1328 (La. 1982). A defendant is, however, entitled to inspect and copy tangible items, including documents, books, and papers, which are within the State’s control and which are favorable to the defendant or are intended for use by the State as evidence at trial. La.Code Crim. Proc. art. 718; Cobb, 419 So.2d at 1241. 1 Accordingly, “[t]he defendant may not be denied exculpatory statements made by a witness other than the defendant provided the statement is material and relevant to the issue of guilt or punishment.” Ates, 418 So.2d at 1328.
 A defendant’s request for such material must be specific and relevant. State v. Davenport, 399 So.2d 201, 202-03 (La.1981). Where a specific request is made and “the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge.” Agurs, 427 U.S. at 106, 96 S.Ct. at 2399; Ates, 418 So.2d at 1328. To determine the nature of the requested material, the trial court may conduct an in camera inspection. La.Code Crim. Proc. art. 718; Cobb, 419 So.2d at 1241; Ates, 418 So.2d at 1328-29. A defendant will nevertheless be denied such an inspection where the State has denied possession of the specific information requested and the defendant has made no contrary showing. Cobb, 419 So.2d at 1241; Davenport, 399 So.2d at 203.
Louisiana jurisprudence has also consistently held a defendant is generally not entitled of right to the names, addresses, and telephone numbers of witnesses in the absence of extraordinary circumstances. State v. Weathersby, 09-2407, p. 2 (La.3/12/10), 29 So.3d 499, 501; State v. Jackson, 608 So.2d 949, 957 (La.1992); *1271 State v. Loyd, 425 So.2d 710, 718-19 (La. 1982); State v. Walters, 408 So.2d 1337, 1339 (La.1982). Disclosure may be warranted, however, with a “determination that there exist peculiar and distinctive reasons why fundamental fairness dictates discovery.” Weathersby, 09-2407 at pp. 2-3, 29 So.3d at 501; State v. Washington, 411 So.2d 451, 451 (La.1982). Still, even in extraordinary circumstances, witnesses should only be “made available” to the defense if the trial court after conducting an in camera interview finds they possess exculpatory information. State v. Golden, 95-0288, 1 (La.2/17/95), 650 So.2d 237, 238.
Nevertheless, the State’s constitutional obligation to disclose exculpatory evidence does not relieve the defense of its obligation to conduct its own investigation and prepare a defense for trial as the State is not obligated under Brady or its progeny to furnish defendant with information he already has or can obtain with reasonable diligence. State v. Kenner, 05-1052, p. 2 (La.12/16/05), 917 So.2d 1081, 1081 (citing United States v. Newman, 849 F.2d 156, 161 (5th Cir.1988)); see also, Michigan v. Harvey, 494 U.S. 344, 348, 110 S.Ct. 1176, 1179, 108 L.Ed.2d 293 (1990) (“The essence of [defendant’s] right [to assistance of counsel for his defense] ... is the opportunity for a defendant to consult with an attorney and to have him investigate the case and prepare a defense for trial.”). It follows, therefore, “ ‘[t]here is no Brady violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source, because in such cases there is really nothing for the government to disclose.’ ” State v. Hobley, 98-2460, p. 25 n. 10 (La.12/15/99), 752 So.2d 771, 786 (quoting Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998)), cert. denied, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000). As the United States Fifth Circuit Court of Appeal has noted:
Regardless of whether the request was specific or general, and regardless of whether the evidence was material or even exculpatory, when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no Brady claim.
The constitutional requirement of due process mandates that the defendant have a right to a fair trial. The prosecutor’s duty not to suppress material information favorable to defendant flows from his office as representative of the Government’s interest in and due process obligation to justice. Truth, justice, and the American way do not, however, require the Government to discover and develop the defendant’s entire defense .... In no way can information known and available to the defendant be said to have been suppressed by the | ^Government.
United States v. Brown, 628 F.2d 471, 473 (5th Cir.1980) (citations omitted). Moreover, the State has, “of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor,” and there is no corresponding “constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.” Agurs, 421 U.S. at 106-09, 96 S.Ct. at 2399-2400; see also Moore v. Illinois, 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972).
Significantly, we note the purpose of Brady “is not to displace the adversary system as the primary means by which truth is uncovered.” Bagley, 473 U.S. at *1272 675, 105 S.Ct. at 3879-80. We further recognize the State and the defense in their adversarial roles are charged with equally encompassing duties, and it is the diligent performance of the State’s duty to disclose and the defense’s duty to investigate that successfully advances this “quest for truth.” State v. Hammier, 312 So.2d 306, 310 (La.1975). Moreover, only when the principles of fundamental fairness so dictate will a trial court be called upon to intervene in the performance of these duties “to ensure that a miscarriage of justice does not occur.” Bagley, 473 U.S. at 675, 105 S.Ct. at 3380; see also Golden, 95-0288 at p. 1, 650 So.2d at 238.
In the present case, both the State and the defense allege the other side has failed in the performance of its constitutional duties. On the one hand, the defendants argue they are entitled of right to Perry’s and Glatt’s contact information because once the defense specifically requests contact information, which is already in the police report, of clearly exculpatory witnesses, then that information has to be turned over to the defense by the State. The State, on the other hand, argues it has more than fulfilled its duty under Brady and the defense has simply failed to exercise due [^diligence in the performance of its “ordinary” duty to investigate. The District Court in an effort clearly meant to appease both sides and protect the witnesses’ privacy interjected itself into the adversarial system, seeking to discover outside the presence of the defense whether the witnesses possess any exculpatory evidence. We find, however, this interjection was improper under the circumstances of this case.
In response to defendants’ requests for discovery, the State, in our view, was generous in disclosing information to the defense and exceeded its obligation arising under Brady and its progeny. The State provided substantial responses to defendants’ request, which significant to this issue included the police reports from this incident, the unre-dacted statements of Perry and Glatt, and their RAP sheets. With this identifying information, the defendants through the exercise of reasonable diligence should be able to locate these individuals prior to trial.[11] The defense has not, however, successfully demonstrated how during the discovery phase of the proceedings its failure to locate the witnesses constitutes an exceptional circumstance or a peculiarly distinctive reason why fundamental fairness dictates discovery of the witnesses’ contact information or their production, particularly in light of the State’s disclosure of their identities and their allegedly exculpatory statements. We find simply stating defendants have a right to conduct interviews with these witnesses regarding a potential discrepancy in T-shirt colors does not satisfy this burden. Accordingly, we find, during the discovery phase and absent exceptional circumstances, the District Court abused its discretion in ordering the production of these witnesses. The State has thus far satisfied its obligations under Brady, and the defense has failed to present any exceptional circumstances or peculiar distinctive |14reasons why fundamental fairness dictates the witnesses’ production, much less the discovery of their contact information, during the discovery phase of the proceedings.
Moreover, we find nothing of record which would either support or require the *1273 production of the witnesses merely to advise them of their right to speak with defense counsel. During a pre-trial hearing, the State confirmed it had spoken with the witnesses, who conveyed their desire not to speak with defense counsel. Not wishing to rely on the State’s assertion in this matter, the defense sought to hear directly from the witnesses.[12] However, nothing indicates and no one has argued the State has directed these witnesses not speak with defense counsel. Accordingly, in the absence of any allegations of such explicit prosecutorial misconduct, no remedial measures, such as an in camera interview, are necessary at this point. See contra, State v. Hammler, 312 So.2d 306, 309 (La.l975)(finding prosecutor’s conduct in explicitly directing the witnesses not to speak to defense attorneys significantly interfered with the defendants’ constitutionally guaranteed right to effective counsel by denying their counsel the opportunity to adequately prepare a defense and the trial court erred in denying a motion to compel the witnesses to speak with defense counsel as a means of correcting the State’s misconduct).
Finally, we find the District Court’s reliance on State v. Golden, 95-0288 (La.2/17/95), 650 So.2d 237, in ordering the production of the witnesses for an in camera interview is misplaced. In Golden, the defense sought the identification of an undisclosed individual, who assisted the police in unlocking a lawfully seized safe 115containing the narcotics, which the defendants were charged with possessing. The State stringently contested the revelation of the individual’s identity, given the individual’s fear of retaliation. In response to the State’s refusal, the trial court ordered the State produce the witness and provide defense counsel with the opportunity of interviewing him before trial. This Court vacated that ruling and ordered the trial court conduct an in camera interview of the prospective witness to determine whether the witness possessed or had access to any evidence, which may have been exculpatory. Only upon such a finding would the State then be ordered to “make the[] individual ] available to the defendants.” Golden, 95-0288 at p. 1, 650 So.2d at 238.
Contrarily, in the instant case, the State has provided defendants with the identity of the witnesses and all the information related to the allegation that their statements could be exculpatory by turning over discovery materials to the defendants, namely the police report, the witnesses’ statements, and their RAP sheets.[13] Therefore, Golden, in which the defense *1274 lacked the identity and statement of a potentially exculpatory witness, is clearly distinguishable from the instant case, wherein the defense possesses both the identity and statements of the allegedly exculpatory witnesses. Consequently, we find the in camera procedure sanctioned by the Golden court and adopted by the District Court is not applicable herein.
|1fiIn conclusion, we find, during the discovery phase and in the absence of a showing of exceptional circumstances or peculiarly distinctive reasons why fundamental fairness dictates the production of the witnesses for an in camera interview, the District Court abused its discretion in ordering their production. Moreover, we find the District Court further abused its discretion in ordering their production when the record contains no evidence the State explicitly or otherwise directed the witnesses not speak with defense counsel. Finally, we find the District Court abused its discretion in adopting the in camera procedure set forth in Golden given the State’s disclosure of the witnesses’ identity and allegedly exculpatory statements. Therefore, we reverse the appellate court’s affirmation of the District Court’s ruling, ordering the production of the witnesses, Perry and Glatt, for an in camera interview, and remand for further proceeding.
DECREE
For the reasons herein, we reverse the judgment of the court of appeal and remand this matter for further proceedings. The stay of proceedings issued by this Court is hereby lifted.
REVERSED; REMANDED TO DISTRICT COURT; STAY LIFTED.

 Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Cath-erme D. Kimball.

. On February 18, 2010, this Court granted the State’s request to stay all proceedings in this matter pending further orders of this Court.

. We note at the outset this matter is before us in a pre-trial posture. Therefore, the facts are still sketchy and any information provided herein is gleaned from the pre-trial hearings, the police reports, and various statements of the victims, witnesses, and defendants.

. Edgar was shot twice in the hip and once in the scrotum, ankle, thigh, buttocks, and lower abdomen.

. According to Raymond's statement, the gun battle only began when Williams pulled out his weapon and started shooting. Williams carried a special officer’s permit, which allowed him to have a concealed firearm on his person. Officers on the scene confiscated "a Glock model 23 .40 caliber black in color” handgun from Williams.

. Interestingly, although Suggs stated he placed Edgar’s "gun back in [Edgar's] pocket” after the shootout, the gun was not located on the scene. Rather, Edgar’s mother brought the gun, "a Taurus model PT140 .40 caliber silver in color,” to the police station two days later.

. Officer Jefferson testified during the November 6, 2009 motions hearing he did not "see Sullivan Harper.”

. Officers located "a Raven Arms Model MP25, .25 caliber handgun black in color with a brown handle” in the street near the curb located directly in front of the location of 811 Conti Street where Officer Adams apprehended Sullivan. A second handgun, "a Smith and Wesson model SW40VE .40 caliber with a black frame and silver slide” was located in the trash can directly in front of the location of 833 Conti Street, where Bernard was apprehended by Officer Jefferson. A total of nineteen spent casings were located on the scene. Twelve spent casing were of .40 caliber and seven were of .25 caliber. A black T-shirt was also located in the driveway of 833 Conti Street.

. Sullivan is 5'09" and 130 lbs., and Bernard is 5'09" and 142 lbs. Defendants were eighteen and nineteen years of age, respectively.

. Although only Bernard filed this motion and all subsequent motions, Sullivan orally joined in each motion.

.Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. According to counsel’s argument to this Court, the defense thus far has unsuccessfully attempted to subpoena the witnesses, has visited the Famous Door where they "may have been employees” at the time of the shooting, and has now hired a private investigator.

. In the January 28, 2010 hearing, defense counsel argued:
And I don't think that we have to rely on the State's assertion that these people don't want to talk to us. Because I don't know what the State told these people before she said do you want to talk to the defense. I think we should have an opportunity to talk to them and hear from them personally or from an investigator if they want to talk to us or if they don't want to talk to us.

. Moreover, defense counsel was able to cross-examine Officer Jefferson during the November 6, 2009 motions hearing about his discussion with Perry regarding the “white T-shirts” statement, and Officer Jefferson stated on the record Perry was adamant in his recollection of the T-shirts’ color, as evident in the following dialogue between defense counsel and the officer:
Q. Did you question him about that since Mr. Bernard Harper was wearing a black T-shirt?
A. Yes. I asked him was he sure, I didn’t mention Bernard or anybody else. I asked him was he sure, he said yeah, he saw two guys with white T-shirts running.
Q. And he stated to you that those two males wearing white T-shirts took their final shot before they ran in the direction of Bourbon, correct?
A. Yes.