NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-949

STATE OF LOUISIANA

VERSUS

TRISTON T. LYONS

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 05-1998
HONORABLE GERARD B. WATTIGNY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

ELIZABETH A. PICKETT
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

AFFIRMED.

J. Phillip Haney
District Attorney – Sixteenth Judicial District
Walter James Senette, Jr.
Assistant District Attorney
300 Iberia Street, Suite 200
New Iberia, LA 70560
(337) 369-4420
COUNSEL FOR STATE-APPELLEE:
    State of Louisiana

Mark Owen Foster
Louisiana Appellate Project
P. O. Box 2057
Natchitoches, LA 71457
(318) 572-5693
COUNSEL FOR DEFENDANT-APPELLANT:
    Triston T. Lyons

**PICKETT, Judge.**

## FACTS

On July 27, 2005, the victim, K'Wasi Lewis, drove his brother's car into a parking lot at a convenience store in Jeanerette, Louisiana. His brother, Aaron Washington, and another man were in the car with him. The defendant, Triston Lyons, and another man were standing and talking in the last available parking space. The victim waited a few minutes for them to move. They did not move, so he honked his horn.

The defendant's associate moved and the defendant followed him. The victim parked and got out of the car; he and the defendant argued. A fistfight ensued and the victim won. However, the defendant ran to the road and called to two other men, who began running toward the scene. The victim and his brother got back in the car and left, this time with his brother driving. The defendant broke the car's windshield with a piece of wood. The defendant and his companions followed the victim and his companions to their neighborhood but turned around and left.

Later, in the early morning hours of July 28, the victim was watching television when someone knocked on the front door. The victim asked who it was, and the person outside gave the nickname of one of the victim's cousins. Lewis got up to look through a small window beside the door. He saw the defendant right outside that window. Surprised, the victim retreated. The defendant fired his gun through the door and shot the victim.

On November 9, 2005, the state filed a bill of information charging the defendant with attempted second degree murder, a violation of La.R.S. 14:27 and

14:30.1. Jury selection took place on April 17, 2006. Three days later, the trial court granted a mistrial.

A second jury selection took place on April 23, 2007. The jury began hearing evidence on April 24; it found the defendant guilty as charged on April 25. On December 8, 2010, the trial court sentenced the defendant to thirty-five years at hard labor without benefit of parole, probation, or suspension of sentence.

He now appeals his conviction, arguing three assignments of error.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER THREE

We will address the defendant's third assignment of error first, because it alleges the evidence was insufficient to support the conviction. Since a holding in the defendant's favor would necessitate a reversal of his conviction, it must be addressed before other issues. *State v. Hearold*, 603 So.2d 731 (La.1992).

When the sufficiency of trial evidence is challenged, the analysis is settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The defendant argues that since identity was the sole issue at trial, the state was required "to negate any reasonable probability of innocence." Further, he contends it did not do so, since it did not prove that the victim was able to see and identity a person on the dark porch. He cites *State v. Neal*, 00-674 (La. 6/29/01) 796 So.2d 649, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002) and *State v. Smith*, 430 So.2d 31 (La.1983) for support. Both cases, however, use the term "reasonable probability of *misidentification*," not "innocence."

As recounted above, the victim looked through the small window near his front door and saw the defendant just before the gun fired. He testified that their faces were "close enough for us to kiss." The victim noted that the porch light was off, but he stated there were two lights on in the room he was in. Also, there were street lights outside. He affirmed that he was able to identify the defendant as the shooter.

This case presents a simple matter of credibility. The victim was the only witness who could identify the defendant, and he did so. Apparently, the jury believed the victim's testimony that he could make the identification despite the fact that the porch light was off. Under the jurisprudence, it is not this court's role to second-guess the jury's assessment.

This court has stated:

As mentioned in *Kennerson*, credibility assessments are within the province of the fact-finder, in this case the jury. A jury may "accept or reject, in whole or in part," any witness's testimony. *State v. Silman*, 95-0154, p. 12 (La.11/27/95), 663 So.2d 27, 28. Clearly, the jury believed the victim's version of events, and Hypolite's brief offers no concrete reason why the jury's conclusion should be considered unreasonable. This court will overturn a jury's credibility assessment only when a witness's own testimony demonstrates that the witness's ability to perceive events was impaired in some way. *See, e.g., State v. Bourque*, 94-291 (La.App. 3 Cir. 11/2/94), 649

So.2d 670, wherein one eyewitness had consumed a large amount of alcohol before the offense and the other was a minor who believed all white men looked alike, and defendant was white.

*State v. Hypolite*, 04-1658, pp. 4-5 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, 1279, *writ denied*, 06-618 (La. 9/22/06), 937 So.2d 381.

In the present case, the victim's testimony did not indicate that his ability to perceive the relevant events was impaired. The following colloquy took place during direct examination:

Q.    When you peeped around the side and you and Triston were basically face to face —

A.    Yes, sir.

Q.    — how long did y'all stay in that position?

A.    It was for a split second. He startled me. I jumped. And I kinda' — when I jumped back, pow, the gun fired. It hit me in the side. So it was very fast.

Q.    All right. And you and I have talked about this.

A.    Yes, sir.

Q.    I mean, you understand that this young man is facing some very serious charges.

A.    Yes, sir.

Q.    And you're basically describing a short period of time here where you saw this person face to face.

A.    Well, we just had a confrontation earlier that evening about 5:00 o'clock. So, I mean, I just - I mean, I'm looking at him right there at my window. I was shocked that the guy would even be there. So he really, really startled me. Boom, and then the gun went off.

Q.    Did you see the gun before it went off?

A.    No, sir.

Q.    Did you see anybody else on the porch?

A.    No, sir.

4

Q.     After this incident, you indicated you heard footsteps on the porch?

A.     Running, like off the porch.

Q.     Could you tell if it was more than one person?

A.     It was just one person. It was only like maybe, boom, boom, off the porch. If it was more than one, it would have been a little more footsteps.

. . . .

Q.     You didn't stand there at the door?

A.     No, sir. It was like, right after he saw who he was looking for and I saw him, he shot.

Q.     Okay.  How confident are you that the person that fired that shot is in this courtroom?

A.     I'm a hundred percent sure.

Q.     Why?

A.     Because I saw him with my own two eyes.

Q.     And would you point to that person one more time?

A.     Right here, sitting with the blue shirt.  (Indicating.)

Q.     And his name is?

A.     Triston Lyons.

For the reasons discussed, this assignment lacks merit.

### ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, the defendant argues the trial court erred in not granting a mistrial when the state made references to his choice to remain silent.  He cites a portion of the state's opening argument, but we will quote a larger portion than the defendant does:

When we watch CSI and these other movies, they're forever talking about motive, opportunity, motive, opportunity, motive, opportunity. They're all here.

Listen to the circumstances. Keep an open mind. Folks, there is no scientific evidence. There's no gun, no fingerprints, no DNA. The crime lab people will be able to say that, yes, a bullet — a gun was fired outside that door, did make that hole, same size as the bullet that went through K'Wasi Lewis on the other side. But we don't have any scientific evidence like we all see on CSI and all these other shows. It ain't there. And that's not unusual, folks. It's just not unusual. If you think about it, shot fired through a door, a person standing on a porch, doesn't touch anything. So there's no evidence to collect, nothing to compare. And when you're not able to get the suspect — in this case, Triston Lyons — until 20 hours after the incident occurred, your ability to run even those types of tests to see if they did or did not fire a firearm become very, very, very chancy. It's just the way the scientific world works. So keep all those factors in mind.

But basically it's going to boil down to, folks, this is a one-on-one case. We'll have some people to confirm that there was a fight and some other elements to establish motive and opportunity. But basically it's what I call a one-on-one case. And it's a question of, when you listen to K'Wasi Lewis and listen to him very close, because primarily based on his testimony, you have to decide beyond a reasonable doubt: Did Triston Lyons fire that shot?

As he did after the passage just cited, the defendant argues the state's description of the present matter as a "one-on-one case" was an indirect reference to his choice not to testify. He notes that La.Code Crim.P. art. 770 provides, in pertinent part,

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to: . . . [t]he failure of the defendant to testify in his own defense[.]

However, we agree with the trial judge that the state was not referring to the defendant's use of his right to remain silent. Rather, the state appeared to be preparing the jury for the lack of physical evidence and the importance of the testimony of the victim.

During its rebuttal, the state did refer to the defendant's silence at trial: "Big deal made by defense counsel about, 'Well, Triston turned himself in. He cooperated.' Yes, 20 hours later. And he lawyered up, wouldn't talk about the

6

shooting." However, there was no contemporaneous objection or motion at this point. Therefore, the issue was not preserved for appeal. La.Code Crim.P. art. 841. Also, the state's comment was a direct response to a portion of defense counsel's closing argument, in which she noted that the defendant "voluntarily turned himself in." We note an earlier discussion by this court:

> The leading case addressing the impact upon a defendant's rights by a State's reference to the defendant's silence is *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In *Doyle*, the defendants were charged with selling marijuana. Separate trials were held, and in both cases, the defendants claimed that they were framed. In an attempt to impeach the defendants' credibility on cross-examination, the prosecutor inquired of each defendant why they had not informed the arresting officer of this defense.
>
> . . . .
>
> In *State v. Bell*, 446 So.2d 1191 (La.1984), the Louisiana Supreme Court underscored the following footnote appearing in *Doyle*:
>
>> It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. Cf. *United States v. Fairchild*, 505 F.2d 1378 (C.A.5 1975).
>
> *Bell*, 446 So.2d at 1192 (quoting *Doyle*, 426 U.S. at 619, n. 11, 96 S.Ct. at 2245, n. 11). The court further observed in its opinion in *Bell* that, in *State v. Sam*, 412 So.2d 1082 (La.1982), a matter in which the State was persistent in cross-examining a defendant regarding his failure to offer an exculpatory explanation at the time of his arrest, the defendant's conviction was reversed in reliance upon *Doyle*. Nonetheless, the court pointed out,
>
>> In *Sam*, however, we noted the *Doyle* Court's recognition that, under certain circumstances, a reference by the prosecutor to a defendant's post-arrest silence is permissible. 412 So.2d at 1084, n. 1, quoting *Doyle*, 426 U.S. [at] 619, n. 11, 96 S.Ct. [at] 2245, n. 11 and citing *United States v. Fairchild*.
>
>> . . . .

7

Thus we see that the *Doyle* proscription against referring to a defendant's post-arrest silence is not without exceptions. *Doyle* itself stated that a defendant's earlier silence may be shown to rebut a defense contention that the defendant had given an exculpatory story to the police after his arrest. In *Fairchild*, a defendant's post-arrest silence was admissible to rebut a contention of active cooperation with the police when in fact the defendant had invoked his Fifth Amendment rights.

Additionally we have refused to reverse a conviction because a prosecutor referred to the defendant's failure to sign the rights form in order to counter suggestions that the defendant's attitude at the time of his arrest was one of nonchalance. *State v. Brown*, 395 So.2d 1301 (La.1981).

*State v. Bell*, 446 So.2d at 1192-93 (footnote omitted).

*State v. Morris*, 04-120, pp. 7-9 (La.App. 3 Cir. 6/9/04), 876 So.2d 247, 252-53,

*writ denied*, 06-1641 (La. 11/19/04), 888 So.2d 193.

Later during rebuttal, the following colloquy occurred:

He is not met by the pizza man. Nobody delivering flowers. It's Triston Lyons come to get his — and we heard that word — vengeance. We heard it from defense counsel. But the vengeance is — wait a minute. It's from Triston, not from K'Wasi. K'Wasi's home. He's finished with it. Triston's not. And he's going to handle it his way with the old-fashioned ambush.

Now what did you think about the flip side? And then I'm going to sit down. There are actually two witnesses here, folks, if you think about it. K'Wasi's lying on the sofa, 1:30 in the morning, hears a knock on the door. "Who is it?" "It's your cousin, Bootsie?" [sic] "Who?" "Bootsie, Bootsie, Bootsie. It's Bootsie." And when K'Wasi finally gets to the window and looks out, he immediately recognizes Triston Lyons. In his words from his own-mouth today: "How sure were you?" "One hundred percent." "Why?" "I saw him." The only guy that can say that, that it's Triston Lyons, is the man who saw him. And that's exactly what he said.

BY MS. JONES:

Objection, Your Honor.

BY THE COURT:

8

Come up.

(The following proceedings were conducted at the bench, as follows:)

BY MS. JONES:

I think that appeared to be a reference to his not taking the stand, Your Honor.

BY THE COURT:

What did you say?

BY MR. LEE:

I said the only man that could say it was Triston was K' Wasi, who saw him.

BY THE COURT:

I don't see -

BY MS. JONES:

It sounded different to me. I'm sorry, Your Honor. That isn't what it sounded like.

BY THE COURT:

Overruled.

(END OF BENCH CONFERENCE)

BY MR. LEE:

You withdraw the objection?

BY THE COURT:

Well, I overruled the objection.

BY MR. LEE:

The only man that could say 100 percent that he saw Triston was the man who got shot, K'Wasi Lewis.

From the context of the latter colloquy, it appears the state's comment was not focused on the defendant. Instead the prosecutor appears to have been

9

focusing on the certainty expressed by his sole eyewitness. We note pertinent jurisprudence:

> However, it is not every mention of the defendant's post arrest silence that is prohibited by *Doyle*. As specified by the Louisiana Supreme Court, in *State v. George*, 95-0110 (La.10/16/95), 661 So.2d 975, 980, "*Doyle* condemns only 'the use for impeachment purposes of (the defendant's) silence at the time of arrest and after *Miranda* warnings.' " The prosecutor may not use the fact of an accused's exercise of his constitutional right to remain silent, after he has been advised of this right, solely to ascribe a guilty meaning to his silence or to undermine, by inference, an exculpatory version related by the accused, for the first time at trial. *State v. Arvie*, 505 So.2d 44, 46 (La.1987).
>
> In contrast, an oblique and obscure reference to the defendant's post arrest silence, where the examination did not stress the right to remain silent or attempt to elicit testimony regarding the defendant's failure to respond to police questioning does not constitute reversible error. *State v. Mosley*, 390 So.2d 1302, 1305-1306.
>
> Therefore, where the State's line of questioning is permissible, when such questioning is an attempt to summarize the extent of the investigation and is not designed to exploit the defendant's failure to claim his innocence after his arrest in an effort to impeach his testimony or attack his defense. *State v. George*, 661 So.2d at 979-980.
>
> Another exception to *Doyle* also exists when the evidence of post arrest silence is relevant to rebut a defense-raised assertion that the arresting officer failed to properly investigate, or that defendant actively cooperated with police when arrested. *State v. Bell*, 446 So.2d 1191, 1194 (La.1984).
>
> This Court has additionally held that a brief reference to post arrest silence does not mandate either a mistrial or reversal where the trial as a whole was fairly conducted, the proof of guilt is strong, and the prosecution made no use of the silence for impeachment purposes. *State v. Campbell*, 97-369 (La.App. 5 Cir. 11/25/97), 703 So.2d 1358, 1361 (citing *State v. Troulliet*, 94-183 (La.App. 5 Cir. 9/14/94), 643 So.2d 1267).

*State v. Ledesma*, 01-1413, pp. 4-6 (La.App. 5 Cir. 4/30/02), 817 So.2d 390, 393.

The context of the state's rebuttal in the present case indicates that it was not trying to exploit the defendant's silence as an indication of guilt. Further, although

the victim was the only eyewitness, he displayed a high degree of certainty in his identification of the defendant.

For the reasons discussed, this assignment lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In his remaining assignment of error, the defendant argues that the trial court erred in not granting a mistrial based on the state's failure to timely disclose the second statement of Aaron Washington, which contradicted his original statement. He claims that there was a history of such problems in this case, as non-disclosure of a statement by another witness lead to an earlier mistrial in this matter. Regarding the trial at issue, he notes that *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963) requires the state to disclose exculpatory evidence to defendants.

During defense counsel's cross-examination of Washington, who is the defendant's brother, the following colloquy took place:

Q. Now it's your testimony here today that you never saw anyone run away after the incident?

A. No, ma'am.

Q. Okay. You never told the police that you saw someone run away?

A. No, ma'am. That was an error that Officer Moore - we had already corrected that after the pretrial the last time.

Q. What do you mean, you had already corrected it?

A. 'Cause Officer Moore thought I told him that when I ran behind the car that I seen Triston run — something about he was running to the car or Triston was in the car or something like that. And we corrected that already. I already made a recorded tape about the whole incident already with Officer Moore.

Q. After one of our hearings?

A. After the pretrial.

Q. Okay. So you told me earlier that you never had any meetings or any discussions about the case. That's not true, is it?

11

A. I guess not.

Q. So what actually happened is, y'all did meet about the case and y'all corrected the little errors that you thought had occurred?

A. Ma'am, I did never tell Officer Moore that. He misunderstood me. I never told Officer Moore that I seen Triston.

Q. That's not my question.

A. I never did tell him that.

BY THE COURT:

No, ma'am. Just a minute. Let him finish his answer.

BY THE WITNESS:

A. I never told Officer Moore that I seen Triston Lyons. He mistaked [sic] it or thought I told him that. And I told him that he — he came ask me about the statement, and he thought I said that, but I did not say it. I never did see Triston Lyons, period. I never seen Triston Lyons after he got shot at all.

Q. That's not my question. My question is — that I asked you earlier if you ever had any discussions about this case, and you got up on that stand and you're under oath and you said, "No." And now you're telling this jury and you're telling me that you had discussions, that you corrected some errors in the report. So did you have the discussions or did you not?

A. I corrected the error, because Officer Moore told me he needed a correct statement about the case.

Q. That's not my question.

A. I didn't correct the errors of —

BY MR. LEE:

Your Honor, he's answered the question as best he can.

BY THE COURT:

Counsel, approach. Counsel, approach.

(The following proceedings were conducted at the bench, as follows:)

BY THE COURT:

Mr. Lee - just a minute. You're not being fair about your questions. The question you asked him was: Have you talked to the DA about this case?"

BY MS. JONES:

No. I said, "Have you had any meetings or discussions about the case?"

BY THE COURT:

With the DA. And he's talking about a policeman. And you're making it look like he was — he lied about talking to the DA.

BY MS. JONES:

He said after a pretrial, which means they had to meet with the DA. They didn't just meet with the police, Your Honor.

BY THE COURT:

But that's not what he said.

BY MS. JONES:

They didn't just meet with the police.

BY THE COURT:

Your question's improper, counsel. You're misleading him in your own question, because your first set-up question was the DA's Office and the DA. Now you're jumping him because he met with the police.

BY MS. JONES:

No, I said, "Or anyone." Or anyone. I qualified it. Or anyone.

BY THE COURT:

All right.

BY MR. LEE:

Does the Court want to know what this is?

BY THE COURT:

I have no interest in it. I don't care.

(END OF BENCH CONFERENCE)

Later, the court questioned Washington during a bench conference and then spoke to counsel:

BY THE COURT:

Q. Did — what did you say to correct your statement? What did you tell Officer Moore that day?

A. I told him the incident that happened, exactly the incident that I just told you all in court. That's what I said. I never did say I had seen Triston.

Q. Tell me what you said.

A. He asked me the whole incident that happened, what I seen and everything, about the fight and everything.

Q. Did he ask you — you're talking about on the cassette tape?

A. Yes, ma'am. I mean, yes, sir. I'm sorry.

Q. Did he ask you if you went outside and saw Triston Lyons?

A. To be honest with you, no, sir. I don't remember him asking me about that.

Q. Well, I thought that's what you were going to correct.

A. That's what I was going to correct, but the question he asked me was what happened. So —

Q. Well, did you tell him you didn't see Triston Lyons?

A. Yes, sir. I told him I did not see Triston Lyons.

Q. All right.

A. I did not see Triston Lyons.

BY THE COURT:

Do you have anything else, counsel?

BY MS. JONES:

No, sir.

14

BY THE COURT:

Okay. You can step down. Go back outside. I don't see how that's exculpatory. He already told you at the other hearing that the statement was incorrect, so you knew it at the other hearing. And it's transcribed at the other hearing that he said it was an incorrect statement. So how are you prejudiced at this point?

BY MS. JONES:

I don't think, Your Honor, that we exactly went into that. I think Mr. Lee said something about that. Let me just check. And we're prejudiced because it's two contradictory statements, because now —

BY THE COURT:

Well, I know. But if he said it at the hearing, you knew about it.

The next day, Lieutenant Marvin Grogan advised that he was unable to locate the statement at issue. He was not able to check in the police department's old building, because he did not have a key. Also, he searched only the 2005 files. Defense counsel moved for mistrial, asserting a *Brady* violation.

The trial court denied the motion, for the following reasons:

BY THE COURT:

All right. First of all, let me say this. The facts so far before this Court reveal that, at the preliminary hearing on April 13, 2006, Mr. Ralph Lee of the District Attorney's Office informed the Court and Miss Jones that in fact Aaron Washington did not go outside and did not see Triston Lyons, did not go outside and did not see Triston Lyons, and that that part of the statement was in error — that part of the report was in error.

And also Aaron Washington testified at that hearing that he did not go — he did not go out immediately and he did not see Triston Lyons, and that that was incorrect.

So defendant and his attorney have known since April 13, 2006 of the discrepancy.

15

Now it's admitted that — Aaron Washington got on the stand in this trial and testified, and it became obvious first time knowledge was imparted to defendant and to the district attorney's office that in fact Aaron Washington had gone back to the city — or he says he went back to the City of Jeanerette to give a statement to the police officers which was recorded, in which he said that — the same thing he said at the preliminary hearing, that he did not go outside and see Triston Lyons.

The police officers have been brought here and testified that he didn't give a statement to either one of them. He didn't give a recorded statement to either one of them. So we have no police officer who has come to this Court to testify that a statement was given and recorded by Mr. Aaron Washington. So I don't know if Aaron Washington is correct or incorrect in what he remembers or what he says. But his testimony is not substantiated by the city police, as far as I can tell, although I do think — I don't remember if Mr. Moore said he did go over there and give a statement. Maybe Moore did say that. So the city may have acknowledged that in fact he went there and gave a recorded statement. In fact, I'm going to change — I'm going to correct myself, and I think Moore did say that.

So we are here today on a motion to have a mistrial and to dismiss the proceedings.

First of all, I note that defendant has not alleged substantial prejudice in connection with the inability of the City of Jeanerette to find this tape recording. And of course, we note that the City of Jeanerette has just moved from one place to another place in the last six months. We all know from practical experience when people move, things do get lost.

The defendant has produced no evidence that the state, the police, or the witness, Aaron Washington, intended to mislead the defendant. And in fact, the defendant was put on notice of the alleged incorrectness of the statement on April 13, 2006, a year ago.

There is no showing by the defendant how he would have altered his strategy, had this information been provided and this recording been provided.

In the case of *State of Louisiana v. Singleton*, 801 So.2d 1150, Fourth Circuit, 2001, writ denied, Louisiana Supreme Court, 825 So.2d 1168, 2002, I find the facts to be similar. The Court held that a mistrial was not warranted for the state's failure to notify the robbery defendant of retrieval and return of the victim's wallet. The state did not give defense counsel a copy of the subsequent police report that indicated the victim's property had been returned, because the report was not part of

16

the state's file at the time. The trial judge ordered the state to produce a copy of the report for defense counsel's immediate review. The trial judge granted a recess to allow defense counsel time to review the report, and defense counsel was allowed to re-cross examine the officer who wrote the report.

The only distinction between that case and this is that the tape is not available. And nobody's — there's been no testimony by any of the officers or by Mr. Washington that there is any exculpatory evidence on that tape except — other than Mr. Aaron Washington's testimony under oath that he did not see Triston Lyons. And of course, that's exculpatory, but that is before the Court and has been to the knowledge of the defendant and his attorney since April 13, 2006.

For those reasons, your motions are denied.

BY MS. JONES:

Note our objection for the record, Your Honor.

The supreme court has explained:

Nevertheless, the State's constitutional obligation to disclose exculpatory evidence does not relieve the defense of its obligation to conduct its own investigation and prepare a defense for trial as the State is not obligated under *Brady* or its progeny to furnish defendant with information he already has or can obtain with reasonable diligence. *State v. Kenner*, 05-1052, p. 2 (La.12/16/05), 917 So.2d 1081, 1081 (citing *United States v. Newman*, 849 F.2d 156, 161 (5th Cir.1988)); *see also, Michigan v. Harvey*, 494 U.S. 344, 348, 110 S.Ct. 1176, 1179, 108 L.Ed.2d 293 (1990) ("The essence of [defendant's] right [to assistance of counsel for his defense] . . . is the opportunity for a defendant to consult with an attorney and to have him investigate the case and prepare a defense for trial."). It follows, therefore, " '[t]here is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source, because in such cases there is really nothing for the government to disclose.' " *State v. Hobley*, 98-2460, p. 25 n. 10 (La.12/15/99), 752 So.2d 771, 786 (quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir.1998)), *cert. denied*, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000). As the United States Fifth Circuit Court of Appeal has noted:

Regardless of whether the request was specific or general, and regardless of whether the evidence was material or even exculpatory, when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to

17

the Court is his lack of reasonable diligence, the defendant has no *Brady* claim.

> The constitutional requirement of due process mandates that the defendant have a right to a fair trial. The prosecutor's duty not to suppress material information favorable to defendant flows from his office as representative of the Government's interest in and due process obligation to justice. Truth, justice, and the American way do not, however, require the Government to discover and develop the defendant's entire defense. . . . In no way can information known and available to the defendant be said to have been suppressed by the Government.

*United States v. Brown*, 628 F.2d 471, 473 (5th Cir.1980) (citations omitted).

*State v. Harper*, 10-356, pp. 11-12 (La. 11/30/10), 53 So.3d 1263, 1271.

In the present case, the defendant became aware at the preliminary hearing in 2006 that Washington could not identify him. At that hearing, the state objected to his testifying because he could not identify the defendant as the shooter. Thus, when the trial took place in April 2007, the defendant could not have been surprised by Washington's testimony on this point. Further, any suggestion that Washington's second statement to police contained any other exculpatory material amounts to mere speculation and is not a ground for relief. *See, e.g., State v. Loyd*, 425 So.2d 710 (La.1982).

For the reasons discussed, this assignment lacks merit.

## CONCLUSION

The defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is not designated for publication.
See Uniform Rules—Courts of Appeal, Rule 2-16.3.